Fred H. KORNAHRENS, III,
Petitioner–Appellant,

v.

Parker EVATT, Commissioner, South Carolina Department of Corrections; T. Travis Medlock, Attorney General of the State of South Carolina, Respondents–Appellees.

No. 94–4008.

United States Court of Appeals,
Fourth Circuit.

Argued April 4, 1995.

Decided Oct. 3, 1995.

ARGUED: Curtis A. Bradley, Covington & Burling, Washington, DC, for Appellant. Donald John Zelenka, Chief Deputy Attorney General, Columbia, SC, for Appellees. ON BRIEF: Timothy C. Hester, Andrew C. Friedman, Robert D. Wick, Covington & Burling, Washington, DC; Ray P. McClain, Charleston, SC, for Appellant.

Before HAMILTON, WILLIAMS, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge WILLIAMS wrote the majority opinion, in which Judge HAMILTON joined. Judge MOTZ wrote a concurring opinion.

## OPINION

WILLIAMS, Circuit Judge:

On the morning of February 9, 1985, Fred H. Kornahrens, III, killed his ex-wife, her elderly father, and her boyfriend's ten-year-old son. After a full trial, a jury found Kornahrens guilty of capital murder and sentenced him to death. Kornahrens never contested the fact that he committed these gruesome crimes. Instead, in all stages of this proceeding, he has challenged the degree of his guilt and debated the proper penalty for his crimes. After exhausting all avenues of state-court relief, Kornahrens sought a writ of habeas corpus from the United States District Court for the District of South Carolina pursuant to 28 U.S.C. § 2254 (1988). Upon a thorough review of Kornahrens's claims by a magistrate judge, the district court denied his petition. Like the other courts before us, we, too, believe that Kornahrens's trial and sentencing were free from constitutional defect, and, therefore, affirm the district court's denial of the writ.

### I.

Although the facts of this case have been set out in prior proceedings, they bear repeating for the purposes of this appeal. Upon returning home from a night out, Kornahrens's ex-wife, Patti Jo Kornahrens (Patti), her boyfriend John Avant, and Avant's ten-year-old son, Jason, encountered an enraged Kornahrens waiting for them at the doorstep. Kornahrens was armed with a handgun and bayonet.

While Avant remained in the car to gather belongings and to awaken his sleeping son, Kornahrens confronted Patti as she exited from the passenger side. Kornahrens looked at Avant, pointed the gun at him, and said, "I'm going to kill you." (PCR App. 801). When Patti called out Avant's name, Kornahrens shot her in the chest. This wound was not fatal. Patti's father, Harry Wilkerson, lived in a house trailer next door. Patti ran inside, calling to Wilkerson for help. Kornahrens followed her into the trailer, encountered Wilkerson, and fatally stabbed him. Still pursuing Patti, Kornahrens followed her back outside. After catching up with her near the car, Kornahrens stabbed Patti to death. Meanwhile, Avant ran into his and Patti's home next to Wilkerson's trailer to get and load his gun. As he was doing so, he began to hear screams from the outside. He quickly left the house, only to see Kornahrens drag Jason across the yard, pin him down and crouch over him. Then, Kornahrens dragged Jason out of sight. At this point, Avant ran to a neighbor's trailer and called the police.

When the police arrived, all three bodies were gone. Kornahrens was arrested the next day when an officer spotted him walking down a road near Wilkerson's trailer. The bodies of Patti, Wilkerson, and Jason were discovered two days later when Kornahrens, after retaining counsel, drew police a map showing the location of their common grave. Stabbing was the immediate cause of death for all three victims; Jason was found with his hands and feet bound with packing tape.

On June 10, 1985, Kornahrens was indicted for the triple murder of Patti, Wilkerson, and Jason. In November 1985, a trial was held and on November 16th Kornahrens was convicted of all three murders. Two days later, on November 18th, a sentencing hearing was held, and the jury returned a recommendation of death, which the trial judge accepted. Kornahrens appealed to the South Carolina Supreme Court, which affirmed his conviction and sentence. *State v. Kornahrens,* 290 S.C. 281, 350 S.E.2d 180 (1986). The United States Supreme Court then denied his petition for certiorari. *Kornahrens v. South Carolina,* 480 U.S. 940, 107 S.Ct. 1592, 94 L.Ed.2d 781 (1987). Next, Kornahrens filed a state petition for post-conviction relief, which the state trial court denied on August 29, 1988. The South Carolina Supreme Court denied discretionary review, and, on May 13, 1991, the Supreme Court denied Kornahrens's second petition for certiorari. 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 128 (1991).

On September 19, 1991, Kornahrens filed this federal habeas action. The case was assigned to a magistrate judge, who denied Kornahrens's request for an evidentiary hearing. On March 31, 1994, the magistrate judge entered a 97–page report and recom-

mendation which the district court adopted after plenary review three months later. Kornahrens timely appealed.

In his petition to this Court, Kornahrens does not raise all of the issues pressed in the court below, focussing instead on seven arguments. Specifically, Kornahrens argues that during the guilt phase: (1) the trial court erred in refusing to give the jury an instruction on the lesser included offense of voluntary manslaughter; and (2) the trial court erroneously defined reasonable doubt as "substantial doubt." Kornahrens also asserts that during the sentencing phase: (3) the evidence was insufficient to show that Patti and Jason were murdered in the commission of a kidnapping, pursuant to South Carolina's statutory aggravating circumstance, see S.C.Code Ann. § 16–3–20(C)(a)(1)(c) (Law.Co-op.1994); (4) the jurors likely misconstrued the unanimity requirement; (5) the trial court erroneously refused to instruct the jury on the mitigating circumstance of lack of a significant criminal history; and (6) he is entitled to a new trial because state law unconstitutionally prevented him from introducing evidence of his future adaptability to prison. Finally, Kornahrens's seventh claim is that his sentencing counsel was constitutionally ineffective. We address each of these issues in turn; however, because the district court found that Kornahrens procedurally defaulted issues 2, 4, and 5, we reserve our discussion of these claims for last.

## II.

During the guilt phase of Kornahrens's trial, the court refused to give the jury an instruction on voluntary manslaughter. Kornahrens argues that pursuant to Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and its progeny, the trial court was required to give such an instruction and its failure to do so constitutes reversible error. We disagree.

■ "A defendant is not entitled to have the jury instructed as to lesser degrees of the crime simply because the crime charged is murder." Briley v. Bass, 742 F.2d 155, 164 (4th Cir.) (analyzing Virginia's lesser included offense doctrine under the Due Process Clause), cert. denied, 469 U.S. 893, 105 S.Ct. 270, 83 L.Ed.2d 206 (1984). Instead, "the Circuit and the Supreme Courts agree that lesser included offense instructions are not required where ... there is no support for such instructions in the evidence." Id. at 165. Under the rule announced in Beck, "due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction." Hopper v. Evans, 456 U.S. 605, 611, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982). Therefore, if a defendant has a particular theory of defense, he is constitutionally entitled to an instruction on that theory if the evidence supports it.

The elements of voluntary manslaughter are well known:

Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation. "Sudden heat of passion upon sufficient legal provocation" that mitigates a felonious killing to manslaughter must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called "an uncontrollable impulse to do violence."

State v. Lowry, —— S.C. ——, 434 S.E.2d 272, 274 (1993) (citations omitted). In Lowry, for instance, Lowry and the decedent were in the midst of a heated confrontation when the decedent menacingly approached Lowry with arms outspread. The South Carolina Supreme Court held that this gesture may have provoked an already anxious Lowry to fire his weapon. Id., 434 S.E.2d at 273–74. In short, to have received a voluntary manslaughter charge on all three counts, Kornahrens must have proffered evidence showing not only that he had no malicious intent to kill his victims, but also that Patti, Wilkerson, and Jason committed some sort of act that would provoke a rational person to kill another.

■ Kornahrens argues that he introduced the following evidence showing that the murders could be considered voluntary manslaughter: (1) Kornahrens testified that

he did not go to Patti's house to hurt anyone; (2) When Patti showed up, Kornahrens panicked when she said "Freddie's here; get the gun!"; (3) Patti pushed her father on to Kornahrens, and her father started to attack Kornahrens; (4) Kornahrens's response was to attack both of them out of self defense; and (5) Kornahrens thought that Jason Avant was actually John Avant attacking him, so he turned quickly and stabbed him. Additionally, Kornahrens argues that Patti and John Avant engaged in a campaign to destroy him mentally and financially. This constant badgering, Kornahrens claims, also added to the provocation. If believed, Kornahrens contends that this evidence would show that the murders were in the heat of passion upon a sufficient legal provocation to support a voluntary manslaughter charge.

Notwithstanding Kornahrens's assertions, we do not see how any of the victims' actions can be construed as provocation to murder. At most, Patti and her father reacted to the presence of an armed assailant. Kornahrens claims that he showed up at Patti's home solely to "talk" with her and Avant—even though he was armed with a bayonet and a handgun. We are confident that under any set of circumstances her reaction to that sight—"Freddie's here; get the gun!"— would not have been a sufficient provocation for Kornahrens to attack and kill her.[1] Furthermore, Wilkerson only attacked Kornahrens after Kornahrens had shot Patti in the chest and chased her into Wilkerson's home. Wilkerson's attack—in self defense and in the defense of his daughter—cannot be said to have provoked Kornahrens to violence, especially considering that Kornahrens attacked Wilkerson after he had already shot Patti. Nothing Wilkerson did pushed Kornahrens over the edge into the heat of passion; if anything, Kornahrens was already in the heat of passion by the time he encountered Wilkerson. Finally, we do not see any

legal provocation for Kornahrens to have attacked Jason. Even if Kornahrens initially thought that Jason was actually Avant, there was no justification for the multiple knife wounds that he inflicted on the boy. Perhaps his theory would be more plausible if Kornahrens rapidly inflicted one or two wounds before realizing that he was attacking Jason, a ten-year-old boy, instead of Avant, a fully grown man; under these circumstances, however, Kornahrens stabbed Jason multiple times and Jason showed numerous defensive wounds.[2]

Therefore, we conclude that the trial court properly denied Kornahrens an instruction on voluntary manslaughter because, very simply, he presented no evidence to support it.

### III.

Kornahrens also challenges three aspects of his sentencing and claims that each error entitles him to another trial for resentencing. First, he argues that the evidence was not sufficient to show that he murdered Patti and Jason "in the commission of a kidnapping," S.C.Code Ann. § 16–3–20(C)(a)(1)(c) (Law. Co-op.1994). Next, he contends that he is entitled to present evidence of his future adaptability to prison pursuant to *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), decided six months after his sentencing. Finally, he raises several allegations of ineffective assistance of counsel during the sentencing phase of his trial. We address each in turn.

### A.

The jury returned a verdict of death based on its determination that Kornahrens had murdered Patti and Jason in the commission of a kidnapping.[3] Under South Carolina law,

---

1. Additionally, we reject Kornahrens' claim that Patti and Avant's long-term harassment of him was sufficient provocation for the murder. Under South Carolina law, the provocation must be such that the defendant is whirled into a sudden heat of passion. Here, Kornahrens was badgered for a long time and, if anything, his decision to confront Patti and Avant shows premeditation rather than a sudden provocation to violence.

2. This is notwithstanding the evidence that Kornahrens bound Jason's arms and legs together with tape while the child was still alive.

3. As to the murder of Harry Wilkerson, the jury found that Kornahrens committed it during the commission of a burglary. *See* S.C.Code Ann. § 16–3–20(C)(a)(1)(d) (Law.Co-op.1976). Kornahrens does not challenge this finding.

kidnapping is "the forceful seizure, confinement or carrying away of another against his will without authority of law." *State v. Smith*, 275 S.C. 164, 268 S.E.2d 276, 277 (1980).[4] The South Carolina legislature has made murder committed "while in the commission of" a kidnapping a capital offense. *See* S.C.Code § 16–3–20(C)(a)(1)(c) (Law.Co-op.1976). As to the murders of Patti and Jason, the sole aggravating circumstance meriting the death penalty that Kornahrens's jury found was the fact that they were killed in the commission of a kidnapping. Kornahrens argues that, as a matter of law, the evidence was insufficient to support this finding, and that, as a result, the sentence of death must be reversed.[5] We must affirm, however, if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

We have no difficulty concluding that the evidence was sufficient for a reasonable jury to decide that Kornahrens murdered Jason during the commission of a kidnapping. Avant testified that he heard screams before he saw Kornahrens dragging Jason across the yard in front of Wilkerson's house. When the police arrived, Jason was gone, along with Patti and Wilkerson. Kornahrens argues that the state failed to introduce any evidence showing that Jason was alive at the time Kornahrens carried him away. Without proof that Jason was alive, Kornahrens contends, no reasonable jury could have found that he was kidnapped against his will. We disagree with this view of the record. The prosecution offered a vital piece of evidence showing that Jason

was alive when Kornahrens kidnapped him. Jason's hands and feet, alone among the three victims, were bound together with tape, clearly implying that there was a need to tie him up. A reasonable jury could have concluded that Kornahrens bound Jason to keep him from escaping until Kornahrens could decide what to do with him. Based on all of the evidence, it was clear that a reasonable juror could have concluded Kornahrens kidnapped Jason while he was still alive.

We agree with Kornahrens, however, that the evidence does not show that he was trying to kidnap Patti. Nevertheless, we still affirm his sentence because we conclude that the evidence was sufficient to show that Kornahrens murdered Patti "in the commission of" kidnapping Jason. As noted above, South Carolina law requires a finding that a murder was committed during the commission of a kidnapping for the perpetrator to be eligible for the death penalty. Kornahrens argues that Jason's kidnapping was too attenuated from Patti's murder to have been carried out in its commission.

The South Carolina courts have not adopted this narrow interpretation of S.C.Code § 16–2–20(C)(a)(1). In *State v. Damon*, 285 S.C. 125, 328 S.E.2d 628, *cert. denied*, 474 U.S. 865, 106 S.Ct. 187, 88 L.Ed.2d 156 (1985), the South Carolina Supreme Court affirmed the defendant's death sentence for murder "in the commission of" an armed robbery, even though the defendant admitted that the robbery was "an afterthought." *Id.*, 328 S.E.2d at 631. "The record is replete with evidence that property ... was stolen *in a continuing sequence of criminal acts at the time of the murders.*" *Id.* (emphasis added). *State v. Jones*, 288 S.C. 1, 340 S.E.2d 782 (1985), *vacated on*

---

4. On a more technical level, Article 9 of the South Carolina Code, at the time of the offense, defined kidnapping as follows:

> Whoever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means whatsoever without authority of law, except when a minor is seized or taken by his parent thereof, shall be guilty of a felony and, upon conviction, shall suffer the punishment of life imprisonment unless sentenced for murder as provided in § 16–3–20.

S.C.Code Ann. § 16–3–910 (Law.Co-op.1985).

5. At first blush, it seems as if this argument would be fruitless, considering that even if these two convictions are reversed, Kornahrens is not challenging the jury's death sentence for killing Harry Wilkerson. Kornahrens claims, however, that the three death sentences are so intertwined that if we reverse the two based on Patti's and Jason's murders, we must also reverse that based on Wilkerson's. Because we affirm the challenged sentences, we need not reach this argument.

*other grounds,* 476 U.S. 1102, 106 S.Ct. 1943, 90 L.Ed.2d 353 (1986), is instructive and, we believe, persuasive. There, the South Carolina Supreme Court questioned whether a defendant who kidnapped a woman immediately after murdering her husband actually murdered the husband in the commission of a kidnapping. The court held that "the fact that the crime[ ] of kidnapping ... [was] committed after the murder and upon a different victim does not invalidate them as aggravating circumstances for [the] murder. The crimes were consummated in a continuous series of acts with the murder. They were committed in the same place and were not separated by any substantial lapse of time." *Id.,* 340 S.E.2d at 784. We believe that the rationale of *Damon* and *Jones* is equally applicable to the instant case. Kornahrens would like us to read "in the commission of" as "in furtherance of." Under his interpretation, unless the murder was effectuated specifically to advance the goals of the kidnapping, the statutory aggravating circumstance would not apply. In *Jones,* the South Carolina courts rejected this reasoning, and we must as well.

Therefore, we hold that the evidence was sufficient to establish that Kornahrens murdered Patti and Jason in the commission of a kidnapping, and, accordingly, we affirm the district court.

### B.

Six months after Kornahrens's sentencing, the Supreme Court invalidated the South Carolina rule prohibiting capital defendants from introducing expert evidence showing their future adaptability to prison life. *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).[6] However, Kornahrens's counsel did not attempt to proffer any expert evidence of future adaptability at his trial. At the time of his sentencing, South Carolina law prevented Kornahrens from introducing this evidence. *See State v. Koon,* 278 S.C. 528, 298 S.E.2d 769, 773–74 (1982). Kornahrens now claims that because

unconstitutional South Carolina law prohibited him from introducing evidence of future adaptability, he is entitled to a new sentencing hearing to present this evidence, notwithstanding the fact that he did not attempt to proffer any such evidence during his original trial.

### 1.

▮▮▮ To assess this unusual problem, we commence with a basic habeas corpus issue: was this issue properly preserved for federal habeas corpus review? Because we review prior state-court judgments with the writ of habeas corpus, basic principles of federalism permit us to review only those state-court decisions that implicate federal constitutional rights. Therefore, if a state court rules against a defendant on federal issues and he has exhausted all avenues of state-court relief, a federal court can hear the defendant's federal claims by way of the Great Writ. Conversely, if a defendant defaults by not following proper state appellate procedure, causing the state courts to rule against him solely on state-law procedural grounds, we have no power to review his defaulted issues because they are based solely on state procedural grounds rather than federal constitutional grounds. As the Supreme Court explained in *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991), if a state prisoner defaulted on his federal claims in state court pursuant to an independent and adequate state procedural rule, he is precluded from asserting such claims in his federal habeas petition unless he shows cause for and resulting prejudice from the default. Therefore, if the South Carolina courts rejected Kornahrens's *Skipper* claim on procedural grounds, we can review it only upon a showing of cause for the procedural default and actual prejudice from the asserted constitutional error. *Wainwright v. Sykes,* 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977) (holding that if the petitioner can show cause for the state procedural default, and prejudice

**6.** Kornahrens's conviction and sentence were not final at the time this decision was handed down, so it is uncontroverted that Kornahrens would benefit from it. *See Truesdale v. Aiken,* 480 U.S.

527, 107 S.Ct. 1394, 94 L.Ed.2d 539 (1987) (applying *Skipper* to all convictions not final or on post-conviction relief at the time the decision was filed).

resulting therefrom, the federal courts can address the issue's merits).

■■■ Only one South Carolina court reviewed Kornahrens's *Skipper* argument because it was not raised either at trial or on direct appeal. During state post-conviction relief, the Court of Common Pleas rejected the argument in one paragraph:

> The Petitioner contends that he is entitled to a new trial because *Skipper v. South Carolina*, 476 U.S. 1 [106 S.Ct. 1669, 90 L.Ed.2d 1] (1986), was rendered after his trial so that he was precluded from presenting evidence of future adaptability to prison life. As previously stated, counsel presented the evidence of his adaptability to prison life by lay witnesses during his trial without objection. Unlike *Skipper*, the trial court *never* precluded him from presenting any testimony or favorable evidence as it relates to his character. To the contrary, Kornahrens was permitted to press, with some emphasis, his good conduct in jail and the jury was allowed to consider such in mitigation of punishment under the charges given for mitigating circumstances. While counsel may have emphasized the testimony "in a more positive fashion" if *Skipper* was decided before the trial, there was no exclusion of such testimony at his trial, only inclusion. *The critical fact is that such evidence was not sought to be presented.*

(J.A. 641–42) (final emphasis added) (internal citations omitted). We believe at least part of this decision—that expert testimony of future adaptability "was not sought to be presented"—was based on Kornahrens's failure to attempt to proffer any expert *Skipper*-type evidence, not whether *Skipper* applied or whether a violation of that decision occurred. In *Ashe v. Styles*, 39 F.3d 80 (4th Cir.1994), we held that where a state adopts alternative holdings—one procedural, one substantive—to deny a prisoner's claim, "a federal court must accord respect to the state law [procedural] ground for decision, even if it is convinced the treatment of federal law was incorrect." *Id.* at 86. According to *Ashe*, if any one of the grounds for decision was an adequate and independent state law holding, a federal court must respect the state law judgment. In Kornahrens's case, the postconviction relief court's exact rationale is unclear; however, it is abundantly clear that even if it did address the merits of Kornahrens's *Skipper* claim, it also defaulted him for not raising the issue at trial. Because, at least in part, the state court's decision was based not on the merits of the *Skipper* decision (i.e. whether Kornahrens was entitled to present this evidence) but instead was based on Kornahrens's failure to proffer, we find that he has procedurally defaulted his claim.

The crux of Kornahrens's argument on appeal, however, is that his failure to proffer at trial is excusable because of the strong deterrent effect of existing state law at the time of trial. Although he has not framed the issue as such, this argument is basically a claim that cause exists to overcome his failure to make a proffer at trial. Essentially, Kornahrens argues that the futility doctrine, which holds that a failure to object at trial is excusable when there is well-established binding authority to the contrary,[7] excuses his default.

■■■ In *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), however, the Supreme Court addressed and rejected the futility doctrine as cause for a procedural default in the habeas context: [8]

> We note ... that the futility of presenting an objection to the state courts cannot alone constitute cause for a failure to ob-

---

7. *See Guam v. Yang*, 850 F.2d 507, 512 n. 8 (9th Cir.1988) (en banc) ("[N]o contemporaneous objection is required when it would have been futile in the trial court because 'a solid wall of circuit authority' foreclosed the trial court from correcting its ruling.") (quoting *United States v. Scott*, 425 F.2d 55, 57–58 (9th Cir.1970) (en banc)). For cases applying these principles, also see *English v. United States*, 42 F.3d 473, 479 (9th Cir.1994); *Murray v. Anthony J. Bertucci Constr.* Co., 958 F.2d 127, 128 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 190, 121 L.Ed.2d 134 (1992).

8. It is unclear whether the futility doctrine can preserve errors on direct appeal as well. The Supreme Court granted certiorari in *United States v. France*, 886 F.2d 223 (9th Cir.1989), to decide this question, but affirmed by an equally divided court, 498 U.S. 335, 111 S.Ct. 805, 112 L.Ed.2d 836 (1991).

ject at trial.... Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid. Allowing criminal defendants to deprive the state courts of this opportunity would contradict the principles supporting [*Wainwright v.*] *Sykes.*

*Id.* at 130, 102 S.Ct. at 1573. Returning to the idea that state courts must have the opportunity to address federal constitutional claims in the first instance, the Supreme Court held that Isaac's failure to object to certain jury instructions doomed his habeas petition, even though those instructions had been consistent with Ohio law for over a century. *Id.* Applying *Engle,* Kornahrens did not give the South Carolina courts the opportunity to hear his claim, and the fact that state law may have deterred him from proffering future adaptability evidence is no excuse. *See id.* at 128–29, 102 S.Ct. at 1572 (explaining that the state courts are given the first opportunity to address a habeas petitioner's claims).

■■■ South Carolina also urges us to find that no prejudice resulted from Kornahrens's failure to proffer because Kornahrens was allowed to introduce lay testimony about his future adaptability to prison. Brief of Respondents at 28. We are mindful, however, that in *Engle,* after finding that there was no cause for the default, the Supreme Court ended its inquiry, noting that because "we conclude[d] that these respondents lacked cause for their default, we do not consider whether they also suffered actual prejudice." *Id.* at 134 n. 43, 102 S.Ct. at 1575 n. 43. Although this statement was only dictum in *Engle,* we agree with its posture. To consider whether Kornahrens also suffered prejudice would constitute an alternative holding, which, as we stated in *Karsten v. Kaiser Foundation Health Plan,* 36 F.3d 8, 11 (4th Cir.1994) (per curiam), should be avoided.

### 2.

Perhaps predicting our holding above, Kornahrens proceeds to the next logical question: he argues that if his fatal error was failing to proffer *Skipper* evidence, then his trial counsel, William Runyon, was constitutionally ineffective for not attempting to do so. Kornahrens notes two factors that should have alerted Runyon to the imminent demise of South Carolina's prohibition on future adaptability evidence: (1) the Supreme Court had granted certiorari in *Skipper* before Kornahrens's trial, and (2) most capital defense attorneys and professional publications were advising capital defendants to raise *Skipper*-type challenges. Additionally, Kornahrens criticizes Runyon's strategy regarding this type of evidence: Runyon testified that he put on lay testimony about future adaptability to elicit an objection from the prosecution that would preserve the error. If a failure to proffer the evidence deprived him of the benefit of *Skipper,* then, Kornahrens contends, Runyon should be held responsible.

In *Griffin v. Warden,* 970 F.2d 1355 (4th Cir.1992), we discussed the proper legal inquiries for determining when a counsel's performance rises to the level of constitutionally ineffective assistance:

> The Supreme Court has devised a two-step inquiry to determine whether a lawyer's poor performance has deprived an accused of his Sixth Amendment right to assistance of counsel. First, the defendant must show that his attorney's performance was deficient. "Deficient performance" is not merely below-average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance. Second, the defendant must show that he was prejudiced by the substandard performance.... Because effectiveness of counsel is a mixed question of law and fact, we owe no special deference to the finding of the state court on the question.

*Id.* at 1357 (citing *Strickland v. Washington,* 466 U.S. 668, 680, 694, 698, 104 S.Ct. 2052, 2060, 2068, 2070, 80 L.Ed.2d 674 (1984)). Additionally, "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an *objective standard of reasonableness....* Judicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 687–88, 689, 104 S.Ct. at 2064, 2065. Finally, we presume that counsel's assistance

was effective and in accord with reasonable professional norms. *Id.* at 690, 104 S.Ct. at 2066.

Our primary difficulty with Kornahrens's claim is his assertion that Runyon's failure to proffer evidence was "outside the wide range of professionally competent performance." *Id.* *Skipper* was on appeal to the Supreme Court at the time of Kornahrens's trial, and Runyon testified that he was aware of that fact. Nevertheless, the case law is clear that an attorney's assistance is not rendered ineffective because he failed to anticipate a new rule of law. *See Honeycutt v. Mahoney,* 698 F.2d 213, 217 (4th Cir.1983); *see also Walker v. Jones,* 10 F.3d 1569, 1573 (11th Cir.) (holding that trial counsel's performance under a similar situation was reasonable "[b]ecause Alabama courts had rejected similar claims and the Supreme Court had not yet decided *Cage* [*v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) ], trial counsel had no basis for objecting to the trial court's instruction on reasonable doubt"), *cert. denied,* —— U.S. ——, 114 S.Ct. 2111, 128 L.Ed.2d 671 (1994); *Randolph v. Delo,* 952 F.2d 243, 246 (8th Cir. 1991) (ruling that trial counsel was not ineffective by failing to raise *Batson* challenge two days before *Batson* was decided), *cert. denied,* 504 U.S. 920, 112 S.Ct. 1967, 118 L.Ed.2d 568 (1992); *Johnson v. Armontrout,* 923 F.2d 107, 108 (8th Cir.) (stating that "counsel's failure to anticipate a change in existing law is not ineffective assistance of counsel."), *cert. denied,* 502 U.S. 831, 112 S.Ct. 106, 116 L.Ed.2d 75 (1991); *Honeycutt v. Mahoney,* 698 F.2d 213, 216–17 (4th Cir. 1983) (deciding that trial counsel was not ineffective for failing to object to subsequently-overruled, but then long-standing, North Carolina law where such objection would have been based on a recent, non-binding First Circuit decision). Based on this clear precedent, we cannot say that, under the facts of this case, Runyon's trial performance was constitutionally deficient because he followed a long-standing and well-settled rule of

South Carolina criminal law—even when that rule was under attack in the United States Supreme Court at the time of trial.[9]

We readily admit that Kornahrens's *Skipper* argument presents the most vexing issue in this case. Kornahrens is unenviably caught in a situation where his trial counsel's performance may have been unwise, but nevertheless constitutionally sufficient. Unfortunately, he is the victim of a necessarily stringent procedural hurdle, coupled with a similarly important deference to attorney performance. Normally, these rules work to the benefit of both litigants and the judicial system as a whole. In this particular situation, however, we recognize that they have worked to Kornahrens's detriment. Nevertheless, the rules are clear, and we are constrained by their inexorable commands. We, therefore, affirm the district court's denial of the writ on these issues.

## C.

Finally, Kornahrens raises several other claims of ineffective assistance of counsel during sentencing. He urges us to find that Runyon was ineffective for failing to investigate and introduce evidence of his mental condition at the time of the murders and evidence of his dysfunctional childhood. Specifically, he claims that Runyon should have better examined the one expert witness that he called to testify at trial, Dr. Schleimer. If Runyon had done so, Kornahrens argues, Dr. Schleimer would have testified that during the murders Kornahrens was in a "dissociative" state, akin to sleepwalking. He also criticizes the depth and method of Runyon's questioning of Dr. Schleimer. Additionally, Kornahrens argues that Runyon should have investigated and met with Dr. Hamrick, a therapist who had worked with Kornahrens several years before the murders, and who would have confirmed Dr. Schleimer's diagnosis. On a different note, but in a similar vein, Kornahrens also argues that Runyon should have probed further into his child-

---

9. Additionally, we note that Kornahrens wisely does not question Runyon's performance on appeal, as nothing in the record conclusively indicates that the Supreme Court decided *Skipper* before Runyon filed Kornahrens's appellate brief

in the South Carolina Supreme Court; as such we will not reach out to review whether Runyon's failure to raise the *Skipper* issue on direct appeal before the South Carolina Supreme Court constituted ineffective assistance of counsel.

hood. If Runyon had done so, Kornahrens claims, Runyon would have discovered mitigating evidence of physical and sexual abuse to present to the sentencing jury. In sum, Kornahrens contends that Runyon's failure to uncover and present to the jury these issues rendered his legal assistance constitutionally ineffective.

 As discussed above, a successful claim of ineffective assistance of counsel requires the habeas petitioner to show his counsel's objectively deficient performance and prejudice resulting therefrom. *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. at 2064–65, 2068. Discussing claims that an attorney has failed to investigate possible defenses or mitigating factors, the Court stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691, 104 S.Ct. at 2066.

 We believe that Runyon's decisions regarding Kornahrens's mental condition and childhood were based upon a sufficient trial strategy. Early in his preparation for trial, Runyon made a deliberate decision to portray Kornahrens as a normal person who simply snapped under the pressure of his divorce and his ex-wife's constant badgering. Runyon decided to pursue this approach from his conversations with Kornah-

rens. In *Strickland*, the Supreme Court made clear that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." 466 U.S. at 691, 104 S.Ct. at 2066. From his conversations with Kornahrens, Runyon was attempting to prove voluntary manslaughter at trial, and, at sentencing, he was attempting to appeal to the jury's compassion for one of their peers who was thrust into an unfortunate and stressful position. Any evidence that Kornahrens was not an average person who snapped under pressure would have been inconsistent with Runyon's overarching trial strategy developed from Runyon's conversations with Kornahrens[10] and Runyon's knowledge of the events at issue. As the magistrate judge stated below, Runyon's "decision was based on his concern that the more [Kornahrens] discussed the situation with trained professionals, the more likely that someone would form an opinion that the murders were cold-bloodedly planned and carried out." (J.A. 828.) Accordingly, we find that Runyon's decision not to investigate further whether Kornahrens was mentally deficient or a victim of childhood abuse was well within the wide range of professionally competent performance.[11]

### IV.

 Generally under South Carolina law, direct appeal is the only avenue of relief for trial related errors of a non-constitutional dimension. *Simmons v. State*, 264 S.C. 417,

---

10. It is important to note that Kornahrens never gave Runyon the slightest indication that he was abused as a child. In fact, according to the magistrate judge, Kornahrens testified at trial that he had a "normal and happy" childhood. (J.A. 829.)

11. We also reject Kornahrens' assertion that the district court erred by failing to conduct an evidentiary hearing. When a state court has resolved the facts important to the habeas issues in an evidentiary hearing, the federal habeas court is not required to hold another hearing unless the petitioner can show cause and prejudice for failing to raise the new factual issues in the state courts. *See Keeney v. Tamayo–Reyes*, 504 U.S. 1, 11–12, 112 S.Ct. 1715, 1721, 118 L.Ed.2d 318 (1992); *see also Tuggle v. Thompson*, 57 F.3d 1356, 1367 (4th Cir.1995) (noting that state court fact findings in habeas review are "presumed to

be correct and [are] binding on the federal district court"). Here, even assuming that Kornahrens can show cause for the default, we do not believe he has been prejudiced for at least two reasons. First, we believe that the evidence Kornahrens would have introduced—witnesses stating that Runyon's failure to introduce evidence of Kornahrens's mental condition and childhood abuse was unconstitutionally unprofessional and prejudicial—was merely cumulative of that which was introduced in his state court habeas hearing. Second, to the extent that it was not cumulative, the district court had the benefit of sworn declarations containing the evidence Kornahrens would have introduced. We believe the district court correctly determined that an evidentiary hearing would have been duplicative and, ultimately, unhelpful.

215 S.E.2d 883, 885 (1975). Post-conviction relief is limited to claims of ineffective assistance of counsel and other errors of a constitutional dimension. Therefore, if a defendant fails to raise a trial related error on direct appeal, he has defaulted the claim. The magistrate judge found that Kornahrens procedurally defaulted the following three arguments because Kornahrens failed to raise them on direct appeal to the South Carolina courts: (1) a challenge to the trial court's instruction on reasonable doubt (first raised in state post-conviction relief); (2) a challenge to the trial court's failure to instruct on the mitigating circumstance of lack of significant criminal history involving the use of violence (first raised at trial, abandoned on direct appeal, reasserted on post-conviction relief); and, (3) a challenge to the penalty phase instructions regarding unanimity (raised for the first time in the district court below). Kornahrens admits that he failed to raise these three claims on direct appeal.

 Notwithstanding this obvious procedural default, Kornahrens contends that South Carolina's practice of *in favorem vitae* (in favor of life) review of the record in death penalty cases allows us to disregard his default. Under *in favorem vitae* review, the South Carolina Supreme Court would "review the entire record for legal error, and assume error when unobjected-to but technically improper arguments, evidence, jury charges, *etc.* are asserted by the defendant on appeal in a demand for reversal or a new trial." *State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315, 324 (1991) (Toal, J., concurring for a majority of the court).[12] Under *in favorem vitae* review, "the appellate court searches the record for error without regard to whether an objection has preserved it." *Id.*, 406 S.E.2d at 326. Although Kornahrens's conviction and sentence received the benefit of *in favorem vitae* review, the South Carolina Supreme Court abolished the rule, calling it an "outdated doctrine." *See id.* at 324. Kornahrens argues that because the South Carolina Supreme Court conducted an

*in favorem vitae* review of the record for all error on direct appeal, it necessarily considered (and rejected) the three errors that he failed to raise specifically on direct appeal; therefore, he argues, the errors were not procedurally defaulted. While this argument may have superficial appeal, we decline to follow it.

### A.

As the district court recognized, the crux of federal habeas corpus review is to provide criminal defendants with a mechanism to review state court interpretations of federal constitutional protections, while providing deference to the state-court proceedings. Because our role is limited to reviewing state-court judgments, federal review is inappropriate if a prisoner failed to raise his claim and have it reviewed by a state court. Even with *in favorem vitae* review, unless the prisoner raises the specific objections before the state court, we cannot determine whether the state court has properly applied federal constitutional principles, or for that matter, whether the state court has even considered these issues at all. In short, we have no state court judgment to review. As the Court explained in *Engle*, "[t]he state appellate courts [must have] a chance to mend their own fences and avoid federal intrusion." *Engle v. Isaac*, 456 U.S. 107, 128–29, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982).

Additionally, we are persuaded by decisions from other circuits that have confronted theories similar to *in favorem vitae* review and rejected them as substitutes for specific review by the state court. For example, Alabama appellate courts are "under a duty in capital cases to 'notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has adversely affected a substantial right of the appellant.'" *Julius v. Johnson*, 840 F.2d 1533, 1546 (11th Cir.) (quoting

---

12. *See also Drayton v. Evatt*, 312 S.C. 4, 430 S.E.2d 517, 519 ("*In favorem vitae* review requires us to painstakingly inspect capital cases to determine whether prejudicial error has been

committed in a trial irrespective of whether an assignment of error has been made by the defendant."), *cert. denied,* ——— U.S. ———, 114 S.Ct. 607, 126 L.Ed.2d 572 (1993).

Ala. R.App. P. 45(a)), *modified on other grounds,* 854 F.2d 400 (11th Cir.), *cert. denied,* 488 U.S. 960, 109 S.Ct. 404, 102 L.Ed.2d 392 (1988). Like Kornahrens, Julius argued that this rule excused him from raising a number of claims on direct appeal because under its direction, the Alabama appellate courts implicitly reviewed the claims that he failed to raise explicitly. The Eleventh Circuit rejected his claim. While noting an earlier decision that had found a procedural default in an Alabama capital case, the court held that "[a]doption of [Julius's] position would preclude a finding of procedural default in virtually every Alabama capital case." *Id.* It concluded that "[u]nless there is some indication that the state court was aware of this issue, we cannot say that the [state] court rejected the merits of petitioner's constitutional claim." *Id.* The court sounded concerns similar to those we have expressed above; namely, that to review effectively a state-court judgment, we must be assured that the state court had an opportunity to confront the federal constitutional issue on the merits. Otherwise, our review would not be a "review" of the state court judgment, but rather would be another avenue of direct appeal. Congress did not intend this outcome when it drafted 28 U.S.C. § 2254, and we will not adopt it now. As we have stated before, "[n]ew theories and claims may not be inserted into a case every time it reaches a new court." *Pruett v. Thompson,* 996 F.2d 1560, 1569 (4th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 487, 126 L.Ed.2d 437 (1993). Seeing that Kornahrens has not attempted to show that he had cause for not presenting these claims on direct appeal and prejudice resulting from the failure, we agree with the district court that these three arguments are procedurally defaulted, and affirm its judgment on this issue.

### B.

■ While we are reluctant to state alternative holdings, *see ante* at 1359, our reluctance is overcome here in light of Kornahrens's *in favorem vitae* review by the state courts and the likelihood of further review of this federal habeas appeal. Even proceeding on the assumption that Kornahrens did not procedurally default on his claims, we believe

that all of his arguments would fail on their merits. First, Kornahrens argues that the trial court's description of reasonable doubt as "substantial doubt" during the guilt phase violated his right to due process because "substantial doubt" connotes a greater degree of doubt necessary to acquit than "reasonable doubt." Although the Supreme Court did hold in *Cage v. Louisiana,* 498 U.S. 39, 41, 111 S.Ct. 328, 329–30, 112 L.Ed.2d 339 (1990), that use of the term "substantial doubt" as a substitute for "reasonable doubt" violates due process, we have since recognized that in conducting a *Cage* analysis, courts must look to the entire context of the jury charge and not just the offending language, reversing only if there is a "reasonable likelihood" that the jury would have applied the instruction in an unconstitutional manner. *Adams v. Aiken,* 41 F.3d 175, 179 (4th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 2281, 132 L.Ed.2d 284 (1995). Under this framework, we do not believe that the jury charge violated Kornahrens's constitutional rights. Although the trial judge used the term "substantial doubt," his charge was almost identical to the one we affirmed in *Adams:* it explained that a reasonable doubt is not an imaginary doubt, but is a lack of evidence or a doubt for which a person could give a reason. Here, like in *Adams,* the full instruction tempered any risk of confusion from the substantial doubt language. *See also Victor v. Nebraska,* — U.S. ——, ——, 114 S.Ct. 1239, 1250, 127 L.Ed.2d 583 (1994) (upholding a "substantial doubt" instruction after reviewing the full context of the jury charge).

■ Next, Kornahrens asserts that the state trial court should have instructed the jury that his lack of a significant criminal history involving the use of violence could mitigate imposing the death penalty, and the court's failure to do so violated his right to due process. *See* S.C.Code Ann. § 16–3–20(C)(b)(1) (Law.Co-op.1985) (establishing the defendant's lack of a significant criminal history involving a crime of violence against another person as a statutory mitigating circumstance). The trial court determined that Kornahrens's prior conviction for assault and battery of a high and aggravated nature precluded the court from giving the requested

instruction, even though this form of assault and battery is not listed in any South Carolina statute defining a "violent crime" or a "crime of violence." After reviewing applicable precedent,[13] we believe the trial court correctly concluded that Kornahrens's conviction for assault and battery was a conviction for a violent crime, and therefore we also find this contention meritless. *See State v. Sims,* 304 S.C. 409, 405 S.E.2d 377, 384 (1991) ("[T]he trial judge has a duty to review all statutory mitigating circumstances and instruct the jury as to any which may be supported by the evidence and *not merely those requested by the defendant.*") (emphasis added), *cert. denied,* 502 U.S. 1103, 112 S.Ct. 1193, 117 L.Ed.2d 434 (1992).

▮ Finally, Kornahrens contends that the trial court's jury instructions during the sentencing phase were so confusing that a "substantial probability" exists that "reasonable jurors ... well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills v. Maryland,* 486 U.S. 367, 384, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988). We disagree. Unlike in *Mills* or its direct descendant, *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), the state trial judge in Kornahrens's sentencing case never informed the jury that it had to find a mitigating factor unanimously. Instead, the judge stressed the importance of unanimity for aggravating factors and never for mitigating factors. Additionally, the judge emphasized that the jury could recommend a life sentence based on its finding of a mitigating factor or for no reason at all. Therefore, because we do not believe that the probability of jury confusion on the issue of unanimity was substantial, we reject this claim on its merits as well.

We conclude that we are barred from reviewing Kornahrens's last three claims because Kornahrens procedurally defaulted in presenting them for federal habeas review.

Even indulging Kornahrens's contention that we are not barred from reviewing these claims because of procedural default, we find that they are without merit.

## V.

For the foregoing reasons, we affirm the judgment of the district court denying the writ of habeas corpus.

*AFFIRMED.*

MOTZ, Circuit Judge, concurring:

I concur in the opinion of the court except for the portion concluding that Kornahrens procedurally defaulted certain claims. In my view, there was no procedural default. However, because I believe that these claims are for the reasons well stated by the majority nonetheless frivolous, I concur in the judgment of the court.

---

13. *See State v. Small,* 307 S.C. 92, 413 S.E.2d 870, 871 (Ct.App.1992) ("Assault and battery of a high and aggravated nature is the unlawful act of *violent* injury to another accompanied by circumstances of aggravation such as the infliction of serious bodily injury, great disparity in the physical conditions of the parties, and the purposeful infliction of shame and disgrace.") (emphasis added & citation omitted); *see also United States v. Byrd,* 995 F.2d 536, 537–38 (4th Cir.1993) (classifying assault and battery of a high and aggravated nature as a crime of violence for the purposes of the career offender enhancement under United States Sentencing Guideline § 4B1.1), *cert. denied,* —— U.S. ——, 114 S.Ct. 2140, 128 L.Ed.2d 868 (1994).