Filed:  January 7, 1997

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 93-7352
(CA-92-2709-3-1AK)
_____

Kamathene Adonia Cooper,

                              Petitioner - Appellant,

        versus

P. Douglas Taylor, etc., et al,

                              Respondents - Appellees.


_____

O R D E R
_____


        The Court amends its opinion filed December 31, 1996, as
follows:

        On page 1, section 6, lines 4-5 -- the sentence is corrected
to read "Judge Luttig wrote a concurring opinion, in which Chief
Judge Wilkinson and Judges Widener and Williams joined."

        On page 14, first full paragraph -- the paragraph is corrected
to read "Chief Judge Wilkinson and Judges Widener and Williams join
this concurring opinion."

                              For the Court - By Direction


                              /s/ Patricia S. Connor
                              _____
                              Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KAMATHENE ADONIA COOPER,
Petitioner-Appellant,

v.

P. DOUGLAS TAYLOR, Warden;

T. TRAVIS MEDLOCK, The Attorney
General of the State of South
Carolina,
Respondents-Appellees.

No. 93-7352

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Falcon B. Hawkins, Senior District Judge.
(CA-92-2709-3-1AK)

Argued: June 4, 1996

Decided: December 31, 1996

Before WILKINSON, Chief Judge, and RUSSELL, WIDENER,
HALL, MURNAGHAN, ERVIN, WILKINS, NIEMEYER,
HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ,
Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion for
the court, in which Chief Judge Wilkinson and Judges Russell, Wid-
ener, Hall, Wilkins, Luttig, and Williams joined. Judge Widener
wrote a concurring opinion. Judge Luttig wrote a concurring opinion,
in which Chief Judge Wilkinson and Judges Widener and Williams joined.
Judge Hamilton wrote a dissenting opinion, in which Judge Murnaghan
joined. Judge Motz wrote a dissenting opinion, in which Judges
Murnaghan, Ervin, Hamilton, and Michael joined.

**COUNSEL**

**ARGUED:** Bonnie Ilene Robin-Vergeer, Supervising Attorney, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. Donald John Zelenka, Assistant Deputy Attorney General, Columbia, South Carolina, for Appellees. **ON BRIEF:** Steven H. Goldblatt, Adam G. Ciongoli, Student Counsel, Susan Curtin Gouldin, Student Counsel, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant.

---

## OPINION

NIEMEYER, Circuit Judge:

Kamathene Adonia Cooper confessed to South Carolina law enforcement officers on three separate occasions that he had murdered Rheupert W. Stewart in Lake City, South Carolina. After conducting a hearing, the South Carolina trial court found those confessions voluntary and otherwise constitutionally sound. Based on those confessions, a jury convicted Cooper, and the court sentenced him to life imprisonment. The Supreme Court of South Carolina affirmed the judgment.

In his petition for a writ of habeas corpus, filed under 28 U.S.C. § 2254, Cooper argued that his confessions were admitted at his state criminal trial in violation of his right to counsel under the Fifth and Fourteenth Amendments. He contended that police took his confessions without honoring his desire to remain silent or his request for an attorney.

Cooper's habeas petition was referred to a magistrate judge who reviewed the entire record and concluded that Cooper's first two confessions were voluntary and not otherwise constitutionally infirm. While finding that Cooper's third confession had been admitted in violation of his right to counsel under Edwards v. Arizona, 451 U.S. 477 (1981), the magistrate judge held that the state trial court's erroneous admission of that confession was harmless because the confes-

sion was cumulative and the jury would have convicted Cooper solely on his first two valid confessions. Accordingly, the magistrate judge recommended that the district court deny the petition for the writ of habeas corpus.

The district court reviewed the matter de novo and agreed with the magistrate judge, concluding that Cooper's first two confessions were not constitutionally infirm and that the admission of the third confession in violation of Cooper's right to counsel was harmless. Accordingly, the district court denied Cooper's petition.

On appeal, a panel of this court, in a divided opinion, reversed the district court's judgment, concluding that admission of the third confession was not harmless because it was "impossible to conclude with any fair assurance" that the third confession did not have a "`substantial and injurious effect or influence' on the jury's verdict." Cooper v. Taylor, 70 F.3d 1454, 1456 (4th Cir. 1995) (citations omitted). The panel ordered that the district court grant Cooper the writ of habeas corpus. In ordering a rehearing en banc, we vacated the panel decision, and now we affirm the judgment of the district court.

I

Rheupert Stewart was found murdered in his home on December 1, 1984. The den where his body was found was in disarray, with pieces of a broken chair scattered about his body. The right rear pocket of his pants had been turned out. An autopsy revealed that Stewart had been beaten with a blunt object and stabbed in the head and chest with a knife. The coroner concluded that Stewart had died the day before from a stab wound to his brain.

A few days after Stewart's body was found, the manager of a local department store informed the police that Cooper had cashed a check drawn on Stewart's account. Cooper had written his driver's license number on the back of what appeared to be a forged check. Based on that information, a warrant was issued for Cooper's arrest.

After Cooper was arrested for forgery, officers advised him of his Miranda right and then asked if he had any questions. He responded,

3

"Yes, what forgery?" When custody of Cooper was transferred to other officers, they too advised him of his rights. Although Cooper did not invoke his right to counsel, he indicated that he did not wish "to make any comments."

Cooper was thereafter taken to the Florence County Sheriff's Department and delivered to Agent Vause. Agent Vause read Cooper his rights a third time and asked him if he wished to take a polygraph examination. Cooper responded affirmatively.

On the way to Columbia, South Carolina, where Cooper's polygraph test was to be conducted, the officers stopped in Lake City to drop off an officer. While the car was stopped in Lake City, Cooper saw Philip Grimsley, an officer of the State Alcoholic Beverage Commission whom Cooper had known for some time. Cooper said, "There goes Phil. I would like to talk to him."

Cooper informed Grimsley that he had been arrested "for stealing a check and cashing it," but insisted, "I ain't killed no man." Grimsley then asked for and obtained permission from Cooper's custodial officers to talk to Cooper in private. Before proceeding, Grimsley asked the officers whether Cooper had been advised of his Miranda rights. When informed that he had, Grimsley returned to the room with Cooper and, nevertheless, read Cooper his rights for a fourth time. Grimsley then asked Cooper if he had anything to say. In response, Cooper indicated only that he had cashed a check in Lake City. According to Grimsley's account, the following then occurred:

> [Cooper] became upset. He was nervous. Tears came into his eyes. I could tell there was something definitely bothering him. I asked him if there was something he needed to say. Something he needed to get off his chest, now was the time to do it.
>
> At this time, he reached over and grabbed my hand and held onto it tightly. And he asked me if I did do it, what would happen to me? What would I get. I looked at him. I asked him, I said you don't want me to lie to you, do you? If you killed Mr. Stewart and you're convicted in Court, you could die in the electric chair or you could receive a life sen-

4

tence. That would strictly be left up to a judge and jury. At this time, he told me, I did it.

Upon hearing Cooper's admission, Grimsley asked Cooper to be more specific so that he could verify Cooper's statement. Although Cooper initially expressed reluctance "to go back through it," he then continued his confession without interruption. Explaining in detail how he had murdered Stewart, Cooper told Grimsley that he had hit Stewart over the head with a chair and stabbed him in the head and chest. Cooper also agreed to make a taped statement in front of other officers.

When the officers in whose custody Cooper was traveling were brought into the room, Agent Vause asked Cooper if he understood his rights as read to him by Officer Grimsley and whether he would talk to the other officers. Cooper responded that he understood his rights and repeated his confession to those officers. Cooper stated that he had visited Stewart's home to discuss repairs to the house that the Cooper family rented from Stewart. Cooper also indicated that he had asked Stewart for a basketball. As Stewart bent over to pick up the basketball, Cooper took a chair and hit Stewart over the head with it three times. Cooper also admitted taking Stewart's checkbook and throwing both the checkbook and the knife he had used to kill Stewart behind a Lake City warehouse.

After confessing twice, Cooper was asked to give yet another confession, this time tape-recorded, which described Stewart's murder in greater detail. At the outset of this confession, Cooper was asked twice whether he wanted a lawyer present. He responded, "Yeah." He was then asked whether he wished to answer "these questions without a lawyer," and again he responded, "Yeah." Finally, the following question was posed, "Kamathene, [do] you wish to answer these questions without your attorney present, without an attorney present?" Cooper answered, "Yes." The officers then proceeded to question Cooper without a lawyer present, and Cooper gave a yet more detailed account of the murder, which was later transcribed and signed by Cooper.

At trial, the prosecution presented the first two confessions as well as the signed transcript of Cooper's taped third confession to the jury.

The prosecution also played the tape of the third confession in its entirety. The prosecution relied heavily upon the taped confession and referred to it several times during closing argument. Cooper presented no defense, and the jury convicted Cooper of murder and forgery.

II

Cooper's petition for habeas corpus relief under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996)[1] presents us with the question of whether the state trial court's decision to admit this third confession into evidence at his murder trial unconstitutionally undermined the reliability of his conviction.

The process already afforded Cooper by the State of South Carolina deserves mention. South Carolina authorities have arrested, tried, and convicted Cooper, and that state's highest court has affirmed his conviction. We must begin, therefore, with a healthy respect for the state courts' ability to conduct just trials and to ferret out constitutional error, both at the trial and appellate levels.

> [Habeas corpus jurisdiction] should be exercised in the light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the States, and in recognition of the fact that the public good requires that those relations be not disturbed by unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution.

Rose v. Lundy, 455 U.S. 509, 515 (1982) (quoting Ex parte Royall, 117 U.S. 241, 251 (1886)). This respect not only enables the federal

---

**1** While this case was pending on appeal, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996). Title I of the Act limits the scope of federal collateral review of state convictions and sentences. We need not decide in this case what additional hurdles Cooper might face under the Act, because, even under the more expansive scope of review under the prior Act, Cooper is not entitled to relief. See e.g., Sherman v. Smith, 89 F.3d 1134, 1142 n.1 (4th Cir. 1996) (en banc).

and state judicial systems to function with a spirit of cooperation and harmony but also conserves their scarce resources.

In the context of these principles of federalism, comity, and finality, there remains a limited role conferred upon federal courts by 28 U.S.C. § 2254: to ensure that persons do not remain in custody because of violations of the United States Constitution or its laws and treaties. See Sherman v. Smith, 89 F.3d 1134, 1141 (4th Cir. 1996). Unless the defendant's custodial status exists by reason of a violation of the federal constitution or laws or treaties, federal courts must yield to the state judicial process. See Barefoot v. Estelle, 463 U.S. 880, 887-88 (1983). Thus, before granting the writ of habeas corpus to a petitioner whose state custody resulted from a criminal conviction, we must determine whether the petitioner's trial violated his federal rights and whether that violation was the cause of his detention, i.e., whether the error was harmful.

Our inquiry into the harmlessness of the alleged constitutional error[2] in this case is whether, in light of the record as a whole, Cooper's third confession had a "`substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)); see also Tuggle v. Netherland, 79 F.3d 1386, 1388 (4th Cir. 1996) (applying Brecht harmless-error standard to improper admission of testimony). In order for an error to have a "substantial and injurious effect or influence," it must have "affected the verdict." O'Neal v. McAninch, 115 S. Ct. 992, 994 (1995). Because juries have a limited number of responses to give in a criminal trial -- guilty, innocent, or cannot decide -- an error is harmless when the error did not substantially sway or substantially influence the response. See Brecht, 507 U.S. at 637 (actual prejudice must be shown); Kotteakos, 328 U.S. at 765 (jury's judgment must not have been "substantially swayed by the error"); cf. United States v. Olano, 507 U.S. 725, 734 (1993) (in context of Fed. R. Crim. P. 52(b), "prejudicial error" means that it must "have affected the outcome").

_____

**2** By assuming arguendo that the third confession was admitted in violation of Edwards, we do not decide that an Edwards violation in fact occurred.

7

Thus, if the evidence is not merely sufficient, but so powerful, overwhelming, or cumulative that the error simply could not reasonably be said to have substantially swayed the jury's judgment, then the error is not harmful. See Sherman, 89 F.3d at 1142 (holding that error was harmless "because it was cumulative of the abundant evidence admitted at trial"); Correll v. Thompson, 63 F.3d 1279, 1291 (4th Cir. 1995) (holding that admission of confession, if error, was harmless because evidence against defendant was overwhelming), cert. denied, Correll v. Jabe, 116 S. Ct. 688 (1996). On the other hand, if the federal court is "in grave doubt" about whether the trial error had a "substantial and injurious effect or influence" on the verdict and therefore finds itself "in virtual equipoise" about the issue, the error is not harmless. O'Neal, 115 S. Ct. at 994. And the determination of whether trial error substantially and injuriously affected the judgment must be made by the court based on its review of the record. Id.

In this case we have no grave doubt about the harmlessness of any error in admitting the third confession. On the contrary, because the record of evidence made in this case is totally one-sided, we conclude without hesitation that the challenged evidence did not affect or influence the jury's verdict. By analogy, the jury witnessed the government score 14 runs with its evidence and the defense score none. If, for the sake of argument, we were required to invalidate what we would expect Cooper to characterize as a government grand-slam home run, the remaining 10-0 score would still have left the jury's verdict the same. In reaching this inevitable conclusion, we do not conduct any independent assessment of the evidence, nor do we weigh it to determine whether it is sufficient to establish guilt. Rather, when viewing the record as a whole, we simply recognize the obvious power of the two other confessions, together with the other overwhelming evidence of guilt, and conclude that the jury's verdict of guilty could not have more fairly represented the facts of record.

The record shows that Cooper's two earlier valid confessions accurately presented at trial the position Cooper voluntarily expressed to the police concerning Rheupert Stewart's murder: "I did it." These two confessions also revealed the grisly details of the murder: Cooper went to Stewart's home to discuss fixing the house that he rented from Stewart; he asked Stewart for a basketball; as Stewart leaned

8

over to pick up the basketball, Cooper took a chair and hit him over the head three times; he stabbed Stewart with the knife in the head and chest; and he took Stewart's checkbook and threw both the checkbook and knife behind a Lake City warehouse.

Moreover, independent indicia in the record buttressed the reliability of these two valid confessions. Testimony revealed that Cooper initiated the first of his confessions after observing a police officer with whom he had a prior acquaintance. It was Cooper, moreover, who first suggested to the officer that anyone had been killed -- Cooper was only being held for forgery. Furthermore, in his first two confessions, Cooper not only described the broken chair and Stewart's stab wounds without ever having been given information about the murder scene, he also revealed the location of Stewart's stolen checkbook and the knife used to kill Stewart.

Cooper's handwriting exemplar and driver's license number on the back of Stewart's check linked Cooper to Stewart and provided a motive. The independent description of the murder scene provided by the officers and the autopsy evidence concerning the cause of Stewart's death corroborated Cooper's confessions. The inescapable conclusion is that Cooper murdered Stewart.

Against that evidence, Cooper offered no evidence of his own, either to contend that his confessions were not voluntary or to cast doubt on his culpability. Indeed, the circumstances that caused the district court to conclude that Cooper's third confession was inadmissible cast no doubt on the trustworthiness of his earlier two confessions. By all accounts, Cooper's third confession was not coerced or otherwise produced by threats, and its substance provides no reason to doubt the trustworthiness of the first and second confessions.

The dissent would apparently adopt a per se rule that if the trial court were to admit tainted evidence that was important, the verdict automatically would become unreliable and the defendant would have to be tried again. It argues that any important evidence ipso facto has an influence on the verdict, and therefore a new trial would be required in every such case. Continuing with our earlier analogy, the dissent would somehow urge that if the grand-slam home run were disqualified and the resulting score were reduced to 10-0, the guilty

9

verdict is per se adversely affected. That, however, is not the law. As the court in Brecht admonished, habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in `actual prejudice.'" 507 U.S. at 637 (citations omitted) (emphasis added). The verdict must have been affected. See O'Neal, 115 S. Ct. at 994; Sherman, 89 F.3d at 1143; Tuggle, 79 F.3d at 1395); Correll, 63 F.3d at 1292. The dissent's approach overlooks the requirement that the error be prejudicial and have an actual effect on the outcome of the trial.

The dissent would also ignore the inescapable conclusion that the evidence against Cooper was both overwhelming and one-sided. It states that an analysis which considers whether the evidence was overwhelming "disregards 50 years of precedent establishing the approach for harmless error review." This observation, however, overlooks the very case that established the review standard for habeas cases. In finding error harmless in Brecht, the Supreme Court observed about the evidence there, "Moreover, the state's evidence of guilt was if not overwhelming, certainly weighty." 507 U.S. at 639. And our cases have similarly considered the impact on the jury of overwhelming, or even cumulative, evidence actually presented to the jury. See Sherman, 89 F.3d at 1142 (tainted evidence harmless because it was "cumulative"); Correll, 63 F.3d at 1291 (tainted evidence harmless because evidence of guilt was "overwhelming"). The dissent would brush aside any analysis of the error's impact on the verdict and needlessly order a new trial at substantial risk and cost to the public. See Brecht, 507 U.S. at 637 (expressing concern that absence of harmless error analysis undermines state sovereignty and imposes significant social costs).

Under the Brecht standard that applies to this case, we readily conclude that any error in admitting Cooper's third confession was harmless. And once we set aside any state trial court's constitutional error as harmless, our task ends. We then must yield to the state judicial system which convicted Cooper of murder and sentenced him to life in prison. The district court's judgment is

AFFIRMED.

10

WIDENER, Circuit Judge, Concurring:

I emphasize that I concur in all of the majority opinion authored by Judge Niemeyer.

I would add a word. I would concur in the result obtained by Judge Luttig's concurring opinion. I regard the reason expressed by Judge Niemeyer and the reasons expressed by Judge Luttig as separate reasons to affirm the judgment of the district court.

LUTTIG, Circuit Judge, concurring:

I agree that any error of the state trial court in admitting Cooper's taped confession into evidence was obviously harmless, and I join in the majority's opinion, which so concludes. It is plain that, considering the overwhelming other evidence against Cooper--including his two earlier confessions to Rheupert Stewart's murder--any error in the admission of Cooper's third confession did not have a "substantial and injurious effect or influence," Brecht v. Abrahmson, 507 U.S. 619, 638 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)), on the verdict rendered by the jury that heard Cooper's case. That is, given the overwhelming other evidence of guilt (i.e., "in light of the record as a whole," Brecht, 507 U.S. at 638), there is simply no reason to believe that the jury's verdict was attributable to the third confession, see Sullivan v. Louisiana, 508 U.S. 275, 279-80 (1993), or, for that matter, that the verdict was affected by this particular confession. There certainly is no ground for saying that the jury's verdict was "substantially swayed" by the third confession, see Kotteakos, 328 U.S. 765. The allegedly inadmissible confession was, as were the prosecution's references to the petitioner's post-Miranda silence in Brecht, "in effect, cumulative." See Brecht, 507 U.S. at 639. Indeed, Cooper's two other confessions are considerably more powerful evidence of the harmlessness of the third confession here, than were the prosecution's repeated references to the petitioner's pre-Miranda silence in Brecht powerful evidence of harmlessness in that case. See id.

In my judgment, the court's judgment could just as easily rest also upon the fact that, contrary to the district court's conclusion, the taped

11

confession was not even arguably obtained in violation of Cooper's rights under Edwards v. Arizona, 451 U.S. 477 (1981).

In Davis v. United States, 114 S. Ct. 2350, 2355 (1994), a case not even cited, much less discussed, in the district court's opinion, the Supreme Court held that, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that the reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," the cessation of questioning is not required. 114 S. Ct. at 2355. Rather, the Court said, law enforcement officials in such a circumstance should (i.e., "it will often be good police practice," id. at 2356) "clarify whether or not [the suspect] actually wants an attorney." Id. The four Justices in dissent would have required additional questioning under such a circumstance. See id. at 2359.

The circumstance described by the Supreme Court in Davis is precisely that facing the officer who questioned Cooper. Cooper had already made two confessions, waiving his right to counsel prior to each, and had consented to have his third confession taped. The taped confession began with yet another recitation to Cooper of his Miranda rights, followed by the question, "Do you wish to answer any of the questions that we may ask you?" Cooper responded, "Yea." The interviewing officer then asked, "Do you understand each of these rights that I have explained to you?" Cooper again responded, "Yea. I can't afford no lawyer." And when the officer asked Cooper again, "Do you wish to answer these questions," Cooper yet again responded, "Yea."

Thereafter, the officer asked Cooper, "Do you wish to have a lawyer present" and "You want a lawyer present," to which Cooper responded again, almost certainly perfunctorily, "Yea." It is as a consequence of this last answer that Cooper contends he had invoked his right to remain silent such that his subsequent confession was unconstitutional under Edwards.

If one considers Cooper's "yea" answer to this last question in complete isolation, as Cooper, naturally, urges, then of course his answer was an unambiguous invocation of his right to counsel. But when considered in the context of the immediately preceding questions and answers, and especially Cooper's earlier waivers and con-

12

fessions, it is rather plain -- and certainly would have reasonably appeared to the officer -- that Cooper simply misspoke and answered "yea" (as he had answered the several preceding questions) when he meant "no," that he did not request the presence of a lawyer. There is no question at all that his answer was, at the very least, ambiguous in the context of his immediately preceding, unequivocal expressions of desire to answer the officer's questions without a lawyer present and his prior full confessions.

Assuming (drawing all inferences in Cooper's favor) that the response was ambiguous, the interviewing officer proceeded exactly as the Supreme Court said he should have proceeded in order to eliminate any ambiguity: He sought to clarify Cooper's response through a reformulation of the question, asking Cooper, "Do you wish to answer these questions without a lawyer." Having received the expected corrected response "[y]ea" from Cooper, the interviewing officer even went further to make absolutely sure that in fact Cooper was not invoking his right to counsel, asking Cooper, "Do you wish to answer these questions without your attorney present, without an attorney present." And, as if in recognition of the confusion his earlier answer had caused and to remove any doubt that he wished to proceed without counsel, Cooper replied affirmatively, "[y]es." In the face of this sequence of questions and answers, and against the backdrop of two earlier full confessions, any argument that Cooper's <u>Edwards</u> rights were violated is frivolous.

Cooper contends that the state waived its right to appeal the <u>Edwards</u> issue because it did not object to the magistrate's report originally finding the <u>Edwards</u> violation. However, he is simply mistaken in this argument. Although we and the Supreme Court have long held that the losing party before the district court and before a magistrate must preserve every claim it intends to raise on appeal lest it waive those claims, <u>see Thomas</u> v. <u>Arn</u>, 474 U.S. 140 (1985) (district court); <u>United States</u> v. <u>George</u>, 971 F.2d 1113 (4th Cir. 1992) (same); <u>Synder</u> v. <u>Ridenour</u>, 889 F.2d 1363 (4th Cir. 1989) (magistrate), we have consistently held that the prevailing party in either forum need not advance on appeal every error it believes was committed by the magistrate or court in the course of ruling in that party's favor. <u>See RTC</u> v. <u>Maplewood Investments</u>, 31 F.3d 1276 (4th Cir. 1994); <u>Blackwelder</u> v. <u>Millman</u>, 522 F.2d 766, 771-72 (4th Cir. 1975)

13

(a prevailing party "may support the judgment by urging any theory, argument, or contention which is supported by the record, even though it was specifically rejected by the lower court."); United States v. Schronce, 727 F.2d 91, 92 (4th Cir.) (holding that the same rules that determine whether we can review errors not brought to the attention of the district court apply to whether a party may challenge before a district court errors committed by a magistrate), cert. denied, 467 U.S. 1208 (1984). Accordingly, because the magistrate in this case ruled for the government, affirming Cooper's conviction and finding any error harmless, the State was under no obligation to object to the magistrate's finding of an Edwards violation, Mr. Zelenka's inexplicable "concession" to the contrary on behalf of the State notwithstanding.

Chief Judge Wilkinson and Judges Widener and Williams join this concurring opinion.

HAMILTON, Circuit Judge, dissenting:

If called upon to determine whether there is evidence, independent of the taped (third) confession, to support Cooper's conviction, I would join the majority opinion. But that is not the determination we are called upon to make. Rather, we are called upon to determine whether the erroneously admitted taped confession had a "substantial and injurious effect or influence in determining the jury's verdict." Kotteakos v. United States, 328 U.S. 750, 776 (1946). Although the majority purports to apply the Kotteakos standard, it strains credulity to contend that the majority actually applies it. This point is evident. The majority never once analytically assesses the central role the taped confession played in the trial, e.g., the prosecutor's heavy reliance on the taped confession during his case-in-chief and in closing argument. Nor does the majority evaluate the effect the taped confession had on the jury in reaching its guilty verdict. Rather, the majority casts aside the taped confession, as though it did not exist, and concludes that the remaining evidence was sufficient to support the verdict. This is precisely what the Supreme Court has instructed us not to do--review the record in search of evidence, independent of the erroneously admitted evidence, establishing guilt. See Kotteakos, 328 U.S. at 765 ("The inquiry cannot be merely whether there was enough [evidence] to support the result, apart from the phase affected by the

14

error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.").**1**

Judge Motz's opinion, which I join, convincingly explains why the admission of the taped confession--the undeniable centerpiece of the

_____

**1** The role an error played in a trial is fundamental to resolving the question of whether it had a "substantial and injurious effect or influence in determining the jury's verdict." Kotteakos, 328 U.S. at 776. This is so because there is simply no other way to assess the"effect or influence" an error had on the jury's verdict. Indeed, our own case law suggests an inquiry of far greater depth than that conducted by the majority. For example, in Tuggle v. Netherland, 79 F.3d 1386 (4th Cir.), cert. denied, 117 S. Ct. 237 (1996), we addressed the issue of whether the introduction of an invalid aggravating circumstance, future dangerousness, could be harmless under Kotteakos, where the jury also found a second valid aggravating circumstance, vileness. The future dangerousness aggravating circumstance was invalidated because of an Ake v. Oklahoma, 470 U.S. 68 (1985), error--at sentencing the trial court improperly admitted the state's expert psychiatric testimony of future dangerousness without providing Tuggle with expert psychiatric assistance. Tuggle, 79 F.3d at 1391. We identified six factors as "relevant" to the inquiry of whether the admission of the invalid aggravating circumstance (future dangerousness) was harmless under Kotteakos:

> (1) the strength of the remaining aggravating circumstance; (2) the evidence admitted (both properly and improperly) at the sentencing hearing to establish the invalid aggravating circumstance; (3) the evidence improperly excluded at the sentencing hearing; (4) the nature of any mitigating evidence; (5) the closing argument of the prosecutor; and (6) any indications that the jury was hesitant or entertained doubt in reaching its sentencing determination.

Id. at 1393. Applying these six factors, we concluded that the erroneous admission of the invalid aggravating circumstance had no substantial and injurious effect or influence on the jury's decision to sentence Tuggle to death. Id. at 1395-96. The six factors cited in Tuggle, in their totality, focused on the role the error played in the sentencing trial and its potential "effect or influence" on the outcome. Similarly, the focus of the inquiry here should be on factors that are relevant to the role the error played in the Cooper jury reaching its verdict.

15

state's case--had a substantial and injurious effect or influence on the jury's verdict. Such substantial and injurious effect or influence is readily apparent from the following: (1) the taped confession, which was the only taped confession, was played to the jury; (2) a copy of the transcript was provided to the jury while the tape was played; (3) the tape and the transcript were provided to the jury during its deliberations; (4) the transcript of the taped confession consumed nineteen pages of the trial transcript; (5) the taped confession covered almost every aspect of the crime, including aspects <u>not</u> corroborated by other evidence; (6) the prosecutor made fifteen references to the taped confession during his closing argument and relied upon the taped confession to describe every fact supporting the state's case; and (7) the trial judge's keen observation that the state's case "hinge[d]" on the taped confession. Indeed, if the erroneous admission of the taped confession in Cooper's trial did not have a substantial and injurious effect or influence on the jury's verdict, then <u>no evidence</u> erroneously admitted could ever be found to have such an effect or influence where there is independent evidence of guilt in the record.

Finally, because this case involves a man who is sentenced to life in prison, the majority's analogy to baseball trivializes the serious nature of this case. If we are to engage in such triviality, it is fair to say the jury in this case witnessed something far different than the 14-0 game suggested by the majority. Rather, what the fans at Yankee Stadium recently witnessed in the eighth inning of the first game of the American League Championship Series is symbolic of what the jury witnessed in this case. A young boy in the stands, while attempting to catch a Yankee fly ball as a souvenir, knocked the ball over the right field wall. Replays showed that the ball could have been caught by an Oriole outfielder; however, the umpire erroneously declared the hit a Yankee home run. The late inning home run tied the game, and the Yankees went on to win. Would the Yankees have won without the umpire's erroneous call? Or, would the Orioles have won? No one knows. What we do know without question is that the umpire's erroneous call had a substantial and injurious effect or influence on the outcome of the game.**2**

_____

**2** Regarding the majority's baseball analogy, I would only add that I never realized it was incumbent upon a criminal defendant to score any "runs" in a criminal trial, as it would seem such a proposition turns the presumption of innocence on its head.

16

It follows that I would reverse and remand with instructions to grant the writ of habeas corpus.

Judge Murnaghan joins this dissenting opinion.

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

Respectfully, and with great regret, I dissent. Today a majority of the court impermissibly shrinks the Great Writ, that most "fundamental instrument for safeguarding individual freedom from arbitrary and lawless state action," Harris v. Nelson, 394 U.S. 286, 290-91 (1969), and in doing so diminishes us all. The majority applies the wrong legal analysis -- whether there was sufficient evidence of guilt without the erroneously admitted taped confession -- to arrive at the wrong result -- a denial of the writ of habeas corpus to Kamathene Adonia Cooper. The court reaches its own "inescapable conclusion" that the evidence presented against Cooper was "overwhelming" without ever coming to grips with the proper legal issue-- what effect the erroneously admitted confession had on the jury at the actual trial at which Cooper was convicted. Application of the correct analysis does not require that we free Cooper, but it surely does require that we afford him a new trial.**1**

I.

Although the majority states the correct standard of harmless-error review, whether the erroneous admission into evidence and playing to the jury of Cooper's detailed and devastating taped confession had a "`substantial and injurious effect in determining the jury's verdict,'" Slip Op. at 7, the majority fails to follow the standard in the most basic manner: the majority never once discusses the effect the error had on the jury at the trial that Cooper actually received. Instead, the

_____

**1** The court must, as the majority does, reach the question of whether the Edwards error in admitting the taped confession was harmless. Regardless of whether the State could have pursued a claim that its admission did not violate Edwards after failing to file any exceptions to the magistrate judge's findings, the State did not do this. Rather, at oral argument, both before the panel and the en banc court, the State expressly and unequivocally waived this claim.

17

majority excises Cooper's taped confession -- the evidence upon which Cooper's trial judge concluded the State's case "[h]inged" -- and considers only the properly admitted evidence. By analyzing only this portion of the evidence the majority reaches its own conclusion that "Cooper murdered Stewart." Slip Op. at 9. The error in this approach can be summed up in a single, common-sense question: Can an appellate court fairly decide whether an error was harmless without once considering the effect of that error on the verdict of the jury which originally considered the trial evidence? The obvious answer is no. Without considering the effect of the error the most an appellate court can do is retry the defendant on appeal with the remaining non-erroneous evidence. That is what the majority does today, and in doing so disregards fifty years of precedent establishing the approach for harmless-error review and adopts a harmless-error approach here-tofore unknown at law in any context.

When assessing whether an error is harmless, it simply is not enough for an appellate court to ignore the effect of the erroneously admitted evidence, conduct an independent assessment of the remain-ing evidence and decide that it is sufficient to establish guilt, or that guilt would be found at another trial. Instead, as every criminal harmless-error case since Kotteakos v. United States, 328 U.S. 750 (1946), has held, the inquiry must focus on the trial that actually occurred, and whether "the error had substantial and injurious effect or influence in determining the jury's verdict" in that trial. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos, 328 U.S. at 776). The majority states the proper standard, but its analysis is totally at odds with that standard, because it never considers the effect that the error in this case had on the verdict of the actual jury that convicted Kamathene Adonia Cooper. The majority's approach thus hypothesizes a jury verdict that never was.

Kotteakos held that under the federal harmless-error statute a court must measure whether the error had a "substantial and injurious effect" upon the jury's decision. Kotteakos, 328 U.S. at 776. In estab-lishing this standard, Kotteakos made the relevant inquiry crystal clear: "it is not the appellate court's function to determine guilt or innocence. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. . . . Those judg-ments are exclusively for the jury . . . ." Kotteakos, 328 U.S. at 763

18

(citations omitted). The question is <u>not</u> whether the jurors were "right in their judgment, regardless of the error or its effect upon the verdict. <u>It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision.</u> The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting." <u>Id.</u> at 764 (citations omitted) (emphasis added). Thus, if "the error did not influence the jury, or had but very slight effect" the error was harmless. <u>Id.</u> at 764. But, if a court cannot conclude "that the judgment was not substantially swayed by the error," the error is harmful. <u>Id.</u> at 765.

Further, in <u>Chapman v. California</u>, which established harmless-error review for constitutional error in criminal cases, the Supreme Court recognized that the harmless-error inquiry must focus on whether "the evidence complained of might have contributed to the conviction." <u>Chapman v. California</u>, 386 U.S. 18, 23 (1967). Thus, in determining that the error in <u>Chapman</u> was not harmless, the Court relied upon the fact that the prosecution "continuously and repeatedly" mentioned the error. <u>Id.</u> at 25.

This understanding of harmless-error review remains black letter law. As Justice Scalia recently stated for a unanimous Court:

> Harmless-error review looks, we have said, to the basis on which "the jury <u>actually rested</u> its verdict." <u>Yates v. Evatt</u>, 500 U.S. 391, 404 (1991) (emphasis added). The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in <u>this</u> trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered - no matter how inescapable the findings to support that verdict might be - would violate the jury-trial guarantee. See <u>Rose v. Clark</u>, 478 U.S. 570, 578 (1986); <u>id.</u> at 593 (Blackmun, J., dissenting); <u>Pope v. Illinois</u>, 481 U.S. 497, 509-510 (1987) (Stevens, J., dissenting).

<u>Sullivan v. Louisiana</u>, 508 U.S. 275, 279-80 (1993) (parallel citations omitted).

19

It is true that the Supreme Court directed in <u>Brecht</u> that when assessing whether a constitutional trial error is harmless on habeas review, a court applies the somewhat less stringent <u>evidentiary</u> standard of <u>Kotteakos</u> instead of the <u>Chapman</u> direct review standard. <u>Compare Brecht</u>, 507 U.S. at 638 (error harmless if it had no "substantial and injurious effect" on the jury's verdict), <u>with Chapman</u>, 386 U.S. at 24 (error harmless if clear "beyond a reasonable doubt" it had no effect on the jury's verdict). But, in <u>Brecht</u> the Supreme Court certainly did not hold that federal courts should suddenly abandon the clear teaching of <u>Kotteakos</u>, <u>Chapman</u>, and every other type of harmless-error review, and focus solely on whether the properly admitted evidence provided sufficient proof of guilt.

Rather, in <u>Brecht</u> the court expressly held that "the <u>Kotteakos</u> harmless-error standard applies" to collateral habeas relief. <u>Brecht</u>, 507 U.S. at 638. Moreover, the <u>Brecht</u> Court applied the <u>Kotteakos</u> standard in its entirety. <u>Id.</u> Both the majority and Justice Stevens' concurrence focus on the effect of the error on the judgment within the trial as a whole.

The <u>Brecht</u> Court began its analysis by noting that "[t]he State's references to [the error] were infrequent, comprising less than two pages of the 900-page trial transcript in this case." <u>Id.</u> at 639. The Court contrasted the small role the error played to the multiple references to similar permissible evidence, as well as the rest of the evidence presented in the case. The Court then "conclude[d] that the [error] which occurred at petitioner's trial did not `substantially influence' the jury's verdict." <u>Id.</u> The <u>Brecht</u> Court's analysis accords with <u>Kotteakos</u>: the key question was the error's influence upon the jury, measured by the prosecution's minimal use of the erroneously admitted evidence, in comparison to the evidence presented at trial as a whole.

Justice Stevens' critical fifth vote concurrence also established that the <u>entire Kotteakos</u> standard applies. Justice Stevens quoted most of the language discussed above from <u>Kotteakos</u> and concluded that:

> The habeas court cannot ask only whether it thinks the petitioner would have been convicted even if the constitutional error had not taken place. <u>Kotteakos</u> is full of warnings to

20

avoid that result. It requires a reviewing court to decide that "the error did not influence the jury," and that "the judgment was not substantially swayed by the error."

Brecht, 507 U.S. at 642 (Stevens, J., concurring) (footnote and citations omitted).

Just two terms ago in O'Neal v. McAninch, the Supreme Court reaffirmed that "the Kotteakos standard applie[s] in its entirety." 115 S. Ct. 992, 996 (1995) (emphasis in original). The O'Neal Court directed that "if a judge has grave doubt about whether an error affected a jury in [a substantial and injurious] way," that error is not harmless. Id. at 995. O'Neal also quotes, with approval, a passage from Kotteakos that makes clear the majority's error in the case at hand:

> If, when all is said and done, the [court] is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

Id. at 995 (quoting Kotteakos at 764-65) (emphasis added).

Further, in every other arena where harmless-error analysis is applied courts have always been admonished to consider the effect the error had on the jury, and not the sufficiency of the remaining evidence. For example, under Federal Rule of Criminal Procedure 52(a), harmless-error review focuses on the effect of the error itself, within the context of the trial as a whole. United States v. Lane, 474 U.S. 438, 449 (1986) ("The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error had substantial influ-

21

ence."); id. at 460 (Brennan, J., concurring in part and dissenting in part) (quoting Kotteakos, 328 U.S. at 760-65). The approach under civil harmless-error review is identical. See 11 Charles A. Wright et al., Federal Practice and Procedure § 2883, at 447 (1995) (quoting Kotteakos, 328 U.S. at 761-62); Black's Law Dictionary 718 (6th Ed. 1990) ("An error is `harmless' if reviewing court, after viewing entire record, determines that no substantial rights of defendant were affected and that error did not influence, or had only very slight influence on verdict.").

Notably, the majority opinion only cites once to Kotteakos, and completely ignores O'Neal's statement (which postdates Brecht) that "the Kotteakos standard applie[s] in its entirety." O'Neal, 115 S.Ct. at 996 (emphasis in original). In fact, the majority relies principally on only two citations to Supreme Court law to justify its approach. The first citation is Brecht's statement that to prevail under Kotteakos a habeas petitioner must "establish that [the trial error] resulted in `actual prejudice.'" Slip Op. at 10 (emphasis omitted) (quoting Brecht, 507 U.S. at 637 (quoting United States v. Lane, 474 U.S. 438, 449 (1986)). If the Brecht Court meant to materially alter its approach to Kotteakos harmless-error review this quotation is not where it said so. The "actual prejudice" language is a quote from United States v. Lane, which relies heavily on Kotteakos, and specifically rejects the majority's approach on the very same page it requires actual prejudice: "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error." Lane, 474 U.S. at 449 (quoting Kotteakos, 328 U.S. at 765). Furthermore, as the case at hand powerfully demonstrates, a defendant suffers "actual prejudice" and then some when a jury has based its guilty verdict upon erroneously admitted evidence. This actual prejudice does not dissipate because a court of appeals, as opposed to a jury, later reaches the "inescapable conclusion" that the properly admitted evidence reweighed on appeal is "overwhelming." Slip Op. at 10.

The second citation relied upon by the majority is the Brecht Court's statement that "[m]oreover, the state's evidence of guilt was if not overwhelming, certainly weighty." Id. at 10 (quoting Brecht, 507 U.S. at 639). The majority ignores a key distinction between its approach and the approach applied in Brecht. The Supreme Court in Brecht did not consider the state's properly admitted "evidence of

22

guilt" standing alone, as the majority does today. The Brecht Court did not even give this evidence primacy. Rather it first considered the erroneously admitted evidence, noting that "[t]he state's references to petitioner's post-Miranda silence were infrequent, comprising less than two pages of the 900 page transcript in this case." Brecht, 507 U.S. at 639. Then, and only then, the Brecht Court compared the effect on the jury of the properly admitted evidence of guilt with the effect of the erroneously admitted evidence, by weighing the state's "infrequent" references to the erroneous evidence against its "extensive and permissible references" to other evidence. Id.

In sum, the majority mischaracterizes Brecht, and ignores the most relevant portions of Kotteakos and O'Neal in conducting its analysis. Thus, although in the case at hand the majority correctly recognizes that "principles of federalism, comity, and finality" underlie our habeas jurisprudence, Slip Op. at 7, it ignores the equally important directive that on habeas review a federal court must consider whether its holding is "consistent with the basic purposes underlying the writ of habeas corpus." O'Neal, 115 S.Ct. at 997. The Supreme Court has explained, "we are dealing here with an error of constitutional dimension -- the sort that risks an unreliable trial outcome and the consequent conviction of an innocent person." Id. In following a misguided and unprecedented approach today, the majority ignores Justice Scalia's warning that harmless-error review must not "hypothesize a guilty verdict that was never in fact rendered -- no matter how inescapable the findings to support that verdict might be -- [because to do so] would violate the jury-trial guarantee." Sullivan, 508 U.S. at 279.

II.

Any possible question as to whether the majority applies the wrong approach vanishes upon examination of its analysis. The majority never even acknowledges the obvious importance of the improperly admitted, detailed, taped, confession to the jury's verdict. This omission is not inadvertent; any examination of the effect of the taped confession inevitably leads to the conclusion that the error in admitting it had a "substantial and injurious effect" upon the jury's verdict, and renders the majority's conclusion to the contrary unimaginable.

23

In the majority's four paragraphs of analysis concerning the evidence presented at trial, the effect of the error upon the judgment is <u>not mentioned once</u>. Instead, the majority conducts its own hypothetical trial to save the State of South Carolina and Kamathene Cooper the "substantial risk and cost" of a new trial. Slip Op. at 10.**2** Although the majority claims not to "conduct an independent assessment of the evidence," it totally disregards the piece of evidence most relied upon by the State at Cooper's trial. The majority is able to deem the evidence presented against Cooper "overwhelming" only by eliminating from the calculus the erroneously admitted taped confession, and considering the remaining evidence alone. Of course, this approach does nothing to establish the basis on which the <u>actual</u> jury in this case based its verdict. In light of the majority's complete disregard for the actual trial Cooper received, it is ironic that it criticizes me for ignoring any "<u>actual</u> effect on the outcome of the trial." <u>Id.</u> at 10 (emphasis in original). Even a cursory review of both opinions reveals it is the majority that never comes to grips with the error's "<u>actual</u> effect on the outcome of the trial."

The majority's approach, however, may be the only one available to it because, as the panel concluded, "it is hard to envision a case in which erroneously admitted evidence was more heavily relied on by the prosecution." <u>Cooper v. Taylor</u>, 70 F.3d 1454, 1467 (4th Cir. 1995).

Even a simple comparison of the volume of testimony relating to the brief earlier confessions with that relating to the erroneously admitted taped confession establishes the insignificance of the former, and overwhelming importance of the latter, in the case the jury actually considered. There are only three extremely brief references to the two earlier confessions in the entire record: (1) two paragraphs of Agent Grimsley's testimony, (2) a single paragraph of Officer Vause's testimony, which takes up a third of a page of trial transcript, and (3) Officer McKenzie's even more circumspect testimony, stating

---

**2** In view of its holding, it is difficult to understand why the majority believes that ordering a new trial would result in "substantial risk." Slip Op. at 10. But, if without the taped confession there is indeed a "substantial risk" that Cooper would not be convicted of murder, then obviously admission of the taped confession cannot be held harmless.

only that "I didn't hear exactly everything. I can remember him saying that he killed Mr. Stewart. I think he said the old man. Yes." In contrast, the taped confession consumes nineteen pages of trial transcript, and details virtually every aspect of the case, including many facts never alluded to in the earlier statements. Id. at 1467-68. Moreover, a written, signed copy of the taped confession was provided to the jury to read as the tape of the confession was played to them, and then both the tape and transcript (unlike the isolated testimony as to the earlier confessions) were provided to the jury during its deliberations. Id. at 1460.

Furthermore, in his closing argument the prosecutor made not just "several," Slip Op. at 6, but more than fifteen different references to the taped confession. Every aspect of the prosecutor's description of the facts to the jury comes straight from Cooper's taped confession. All of these facts are preceded with "he said" or "did he not say," to hammer home Cooper's own voice stating the facts. As the panel noted, the closing argument:

> is literally saturated with references to the taped confession. We pick just three examples. First, the prosecution explained to the jury that it did not need to rely on implied malice because "out of Cooper's mouth" jurors had heard evidence of "real, hard, actual real world malice":

> . . . you look at the facts of this case and when you hear Mr. Cooper's own voice telling you that he took that kitchen knife with him thinking he would use it against Mr. Stewart to rob him or kill him. When he tells you in his own voice and signs a statement a day later saying after he had given me the newspapers, I got him to turn around and reach for the basketball so his back would be to him so I could clobber him with the chair.

> There you see, not only what the law calls implied malice, because when you use a deadly weapon like a knife against somebody, that's a fact you can use to infer malice, evil intent. But when you hear out of the words of somebody's mouth,

25

this is the way I did it. I took it ahead of time. Well, I didn't know if I was going to kill him, but as I sat there, I just decided to do it. I formulated a plan. I got him to turn around. I made sure it was done. That's real, hard, actual real world malice.

(emphasis added). Second, the prosecution pointed out that the jury had, by "listening" to what Cooper had "said," learned his motive for murder:

Now, the law does not require us to prove motive. But you can look at facts and you can listen to what he said and you see motive there. What is the first thing this man, Kamathene Cooper did after he had rendered this man senseless and sent him towards his inevitable death?

He went through his pockets. He went through his pockets. And you will recall on his statement from reading along and listening. I looked, but I didn't find anything. And he said I went in other rooms, but I didn't find anything. And, of course, you see the evidence that he went through Mr. Cooper's (sic) pocket. You see the evidence as corroborated in his statement that he did, in fact, go in that room where the stereo was and pull to one side that curtain not realizing what was there.

(emphasis added). Third, the prosecution concluded its argument with numerous rhetorical questions based on what Cooper "said" or "told" the jury:

Did he not say in the statement that he had the gentleman to bend over in the corner to look for a basketball? Is this not the basketball? Did he not say that he hit the man with a chair? Do we not have the chair? Did he not say that he was admitted into the house without having a break-in and Mr. Gravely not tell you that there was no sign of forcible entry[?]

26

> Did he not tell you that he stabbed the man with
> a knife? And did Dr. Conrad not tell you that the
> man had a stab wound to the head that penetrated
> his brain? Did he not tell you that he stole a check-
> book? And do we not have the stolen checkbook?
> Did he not take the officers to where the check-
> book was and are there not photographs of him
> being there? Did he not say I took about six checks
> out? And are there not but about five or six checks
> missing? Did he not say that he went to Thomlin-
> son's? And did Mr. King not verify that he had
> been at Thomlinson's? Point after point after point
> after point after point.

Cooper, 70 F.3d at 1466-67 (emphasis in original).

Finally, totally unacknowledged by the majority is the assessment
of the State trial judge, who is in a far better position to assess the evi-
dence than this court on habeas. In denying Cooper's motion for a
directed verdict, the State court expressly recognized:

> . . . of course, the case hinges and will stand or fall upon
> the alleged confession. And I have previously denied your
> motion to suppress that evidence. And in furtherance of that
> motion, of course, there was at least a day that elapsed after
> the making of the statement on the tape and then the typing
> it up and then giving it back to him. He had an opportunity
> to read it and refuse to sign it and deny it if he had so
> desired and I think those are questions of fact for the jury,
> sir, and I would deny your motion.

(emphasis added). Thus, the trial court, which heard all of the evi-
dence in the case, was absolutely clear that the taped confession alone
-- not in conjunction with the brief earlier statements -- would be
determinative of the jury's verdict.**3** To ignore the State trial court's

_____

**3** To suggest, as the concurrence does, that on this record the errone-
ously admitted taped confession was "cumulative" to the short and
poorly recollected testimony concerning Cooper's earlier statements is
equivalent to suggesting that a blizzard is cumulative to a snow flurry.

27

considered view of the effect of the taped confession, as the majority does, is at odds with both the Supreme Court's observation in Brecht that "state courts often occupy a superior vantage point from which to evaluate the effect of trial error," Brecht, 507 U.S. at 636 and the majority's own "healthy respect" for state courts. Slip Op. at 6.

In sum, the case that the majority deems "overwhelming," is a case cobbled together from evidence that was at best a sidelight at Cooper's actual trial. It is certainly not the case the jury actually considered when it convicted Kamathene Cooper. There can be no question that under the proper standard of harmless-error review, which examines "the basis on which the jury actually rested its verdict" or "whether the guilty verdict actually rendered in this trial was . . . unattributable to the error," Sullivan, 508 U.S. at 279 (emphasis in original) (quotation marks omitted), the majority opinion is flatly wrong.

III.

In addition to the majority's fundamentally flawed approach to harmless-error review, it errs in several other respects.

For example, the majority asserts that Cooper "offered no evidence of his own . . . to contend that his confessions were not voluntary." Slip Op. at 9. In fact, the record establishes that Cooper has consistently maintained that all three confessions were involuntary, and presented expert testimony that he did not understand his rights and did not effectively waive them. Cooper, 70 F.3d at 1469. (Indeed, again before us Cooper continues to assert that like the taped confession, the two earlier confessions were obtained in violation of his "Fifth Amendment rights to remain silent;" a claim the majority simply ignores.) Voluntariness is a jury issue, and the taped confession severely impeded Cooper's assertion that the other confessions were involuntary, because it allowed the jurors to hear Cooper, in his own voice, acknowledging his Miranda rights, and describing the killings. Without the tape Cooper could have pressed the officer's vague recollections of his other two confessions, and perhaps established involuntariness. Moreover, as the panel concluded after it considered all of the evidence relied upon by the majority (and in much greater detail), "without the taped confession not only would the most powerful evidence against Cooper have been eliminated, but much of the other

28

evidence against him would not have been available or would have been irrelevant." Id. at 1467-68.

Moreover, the majority utterly fails to address the Supreme Court's analysis in Arizona v. Fulminante, 499 U.S. 279 (1991). It does not even cite Fulminante, in which the Supreme Court explained:

> the defendant's own confession is probably the most proba-tive and damaging evidence that can be admitted against him . . . . [A] full confession in which the defendant dis-closes the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision . . . . [Thus,] a reviewing court [must] exercise extreme cau-tion before determining that the admission of the confession at trial was harmless.

Fulminante, 499 U.S. at 296. In words directly applicable here, the Fulminate Court went on to hold that the admission of the defendant's first confession was not cumulative or harmless, even though the State had properly admitted a second, more detailed confession because "the jury's assessment of the [admissible] confession . . . could easily have depended in large part on the presence of the [inad-missible] confession . . . ." Id. at 298.

Although Fulminante was decided under the less strict Chapman evidentiary standard, the prejudice the taped confession caused Kamathene Cooper far outweighs the prejudice at issue in Fulminante, and the State of South Carolina has never asserted that Fulminate would be decided differently under the Brecht evidentiary standard. See Cooper, 70 F.3d at 1465. As Justice Stevens aptly stated in his Brecht concurrence, "Justice Kennedy's cogent analysis [in Fulminante] demonstrated that the error could not reasonably have been viewed as harmless under a standard even more relaxed than the one we announce today . . . . In the end, the way we phrase the gov-erning standard is far less important than the quality of judgment with which it is applied." Brecht, 113 S. Ct. at 1725 (Stevens, J., concur-ring). Of course, Justice Stevens could hardly have foreseen the deci-sion of today's majority, which both follows a misguided legal approach and applies an analysis that flies in the face of Fulminante as well as fifty years of harmless-error precedent.

29

IV.

Today, a majority of the court disregards the correct approach to harmless-error review, which requires an examination of the trial that actually occurred. Instead, the court conducts its own shadow-trial and concludes that without the improperly admitted taped confession there was sufficient evidence to convict Cooper. This approach "hypothesize[s] a guilty verdict that was never in fact rendered" -- the precise result Justice Scalia warned against in Sullivan v. Louisiana, 508 U.S. at 279.

If it is appropriate to analogize a criminal trial at which a man has been convicted of murder and sentenced to life imprisonment to a baseball game, that analogy -- as clearly as anything else -- exposes the fundamental flaw in the majority's entire approach. When the majority retallies the "score" against Kamathene Cooper without "the government['s] grand-slam home run," Slip Op. at 8, it unequivocally demonstrates its lack of understanding of harmless-error review. It is not enough for an appellate court to ask how the "game" would have turned out without the erroneous evidence, instead a court is required to ask how the State won the "game". In this case the State did not run up the score before hitting a grand slam; the entire "game" turned on the erroneous evidence.

The majority may well be right that South Carolina could in another trial convict Cooper, without reliance on the erroneously admitted taped confession. The majority is unquestionably wrong, however, in concluding that the error in admitting the taped confession in the trial at which Cooper was actually convicted was harmless. The admission of, and heavy reliance on, the taped confession at Cooper's trial could only have had "substantial and injurious effect or influence" on "the jury's verdict." Brecht, 507 U.S. at 637.

More than one hundred years ago, the Supreme Court recognized that "[t]he great writ of habeas corpus has been for centuries esteemed the best and only sufficient defence of personal freedom." Ex Parte Yerger, 8 Wall 85, 95 (1868). I respectfully dissent from today's decision, which ignores precedent and cripples this most critical safeguard to the personal freedom we all cherish.

Judges Murnaghan, Ervin, Hamilton, and Michael join this dissenting opinion.

30