PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

ANDREW LAVERN SMITH,
Petitioner-Appellant,

v.

MICHAEL MOORE, Commissioner,

South Carolina Department of
Corrections; CHARLES CONDON,
Attorney General, South Carolina,
Respondents-Appellees.

No. 97-18

Appeal from the United States District Court
for the District of South Carolina, at Rock Hill.
Joseph F. Anderson, Jr., District Judge.
(CA-96-212-0-17BD)

Argued: December 1, 1997

Decided: March 4, 1998

Before LUTTIG, WILLIAMS, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Judge Luttig joined. Judge Motz wrote a separate opinion con-
curring in all of the opinion of the Court except for Part II.B.

_____

COUNSEL

ARGUED: John Henry Blume, III, CORNELL LAW SCHOOL, Ith-
aca, New York, for Appellant. Lauri J. Soles, Assistant Attorney Gen-
eral, Columbia, South Carolina, for Appellees. ON BRIEF: Sheri

Lynn Johnson, CORNELL LAW SCHOOL, Ithaca, New York; Teresa L. Norris, CENTER FOR CAPITAL LITIGATION, Columbia, South Carolina, for Appellant. Charles M. Condon, Attorney General, John W. McIntosh, Deputy Attorney General, Donald J. Zelenka, Assistant Deputy Attorney General, Robert F. Daley, Assistant Attorney General, Columbia, South Carolina, for Appellees.

_____

## OPINION

WILLIAMS, Circuit Judge:

On January 14, 1984, a South Carolina jury convicted Andrew Smith of the brutal murders of Christy and Corrie Johnson. Following the jury's recommendation, the trial court sentenced Smith to death. After exhausting his state appeals, Smith petitioned the federal district court for habeas corpus relief. See 28 U.S.C.A. § 2254 (West 1994).[1] The district court denied his petition for a writ of habeas corpus and granted his motion for a certificate of probable cause to appeal. On appeal, we conclude that none of the numerous claims raised by Smith provide a basis for habeas relief. Accordingly, we affirm.

_____

[1] Smith filed his habeas petition exactly three months prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). See Pub. L. No. 104-132, 110 Stat. 1214 (enacted on April 24, 1996). As a result, § 104 of the AEDPA, which amended 28 U.S.C.A. § 2254(d) (West Supp. 1997), does not apply to this appeal. See Lindh v. Murphy, 117 S. Ct. 2059, 2067-68 (1997) (holding that the new habeas standards of review do not apply to habeas petitions pending in federal court prior to the enactment of the AEDPA). Accordingly, we review Smith's "claims under pre-AEDPA law." Howard v. Moore, 131 F.3d 399, 403 (4th Cir. 1997) (en banc) (applying pre-AEDPA law to capital habeas petition filed prior to enactment of AEDPA).

Section 107 of the AEDPA is also inapplicable to this appeal. South Carolina "contends that it became eligible for the procedures outlined in § 107 of the AEDPA as of June 18, 1996." Id. at 403 n.1. Even if true, Smith's state habeas petition was finally decided by the South Carolina Supreme Court prior to that date. See Bennett v. Angelone, 92 F.3d 1336, 1342 (4th Cir.) (concluding that § 107 is inapplicable if petitioner's state habeas petition had been finally decided prior to that state satisfying the opt-in requirements), cert. denied, 117 S. Ct. 503 (1996).

I.

On Saturday, May 28, 1983, Smith, armed with a pistol and a
knife, went to the home of Christy and Corrie Johnson to see whether
he could borrow their car. After the eighty-six year old Mr. Johnson
refused, Smith struck him with such force that he fell to the floor.
When the eighty-two year old Mrs. Johnson came to her husband's
aid, Smith reached for his knife and stabbed her several times. Smith
then stabbed Mr. Johnson as he got up from the floor to help his wife.

During the course of the attack, Mrs. Johnson was stabbed seven-
teen times on and about her face, back, chest, and hands. Mr. Johnson
suffered twenty-seven stab wounds, including several defensive
wounds, on and about his face, neck, chest, hands, wrists, and back.
In addition to the stab wounds, both victims had "blunt force" injuries
consistent with having been struck with a pistol. [2] Dr. Joel Sexton, the
forensic pathologist who performed the Johnsons' autopsies, testified
that most of the Johnsons' wounds and injuries were inflicted before
death and during consciousness.

After leaving his knife in Mrs. Johnson's back, Smith took the keys
to the Johnsons' car and drove away from the scene. The following
day, the police found the Johnsons' car stripped of its wheels, battery,
spare tire, and various other parts. Based upon several different tips,
the police lawfully searched the residence of Smith's mother. There,
the police found the parts taken from the Johnsons' car.

Smith was arrested and charged with the two murders. After waiv-
ing his Miranda rights, Smith confessed to brutally murdering the
Johnsons.[3] In addition, Smith identified the knife found in Mrs. John-

_____

[2] Mr. Johnson's skull was fractured in two separate places. Mrs. John-
son's skull was lacerated in several locations.

[3] Smith's confession reads, in pertinent part, as follows:

> Last Saturday I was drinking all day and walking. I needed a ride
> and I wanted to see if Christy Johnson would let me borrow his
> car, so I walked up to his house and he wouldn't let me use the
> car. We got to arguing. I got mad and I hit Christy Johnson. He
> fell to the floor and Corrie, his wife, came at me with something,

3

son's back as the knife he used to stab the Johnsons. Moreover, Smith told the police that he hid the pistol he had used during the murders in the false ceiling at his place of employment.

Smith was indicted in October of 1983 on two counts of murder. At that time, the State notified Smith that it intended to seek the death penalty. Before the trial began, the trial court held a hearing to determine Smith's competency to stand trial. Dr. John Dunlap, a psychiatrist at the South Carolina Department of Mental Health, testified at the hearing that Smith was capable of assisting his counsel and competent to stand trial. Based upon the evidence introduced at that hearing, the trial court specifically found, beyond a reasonable doubt, that Smith was competent to stand trial.

Smith's trial began on January 9, 1984. Smith raised an insanity defense and presented the testimony of Dr. Helen Clark, a clinical psychologist. Dr. Clark testified that Smith suffered from schizophrenia and a dissociative disorder at the time of the murders and could not distinguish right from wrong. Smith elected not to take the stand in his own defense. In reply, the State introduced the testimony of Dr. Spurgeon Cole, also a clinical psychologist. Dr. Cole testified that Smith's test results did not support Dr. Clark's conclusion that Smith was legally insane at the time of the murders. On January 14, 1984, the jury rejected Smith's insanity defense and found him guilty on both counts of murder. At the conclusion of the subsequent sentencing phase, the trial court, following the jury's recommendation, sentenced Smith to death.

On direct appeal, the South Carolina Supreme Court affirmed Smith's convictions and death sentences. See State v. Smith, 334 S.E.2d 277 (S.C. 1985). The United States Supreme Court denied Smith's petition for a writ of certiorari. See Smith v. South Carolina, 475 U.S. 1031 (1986). Smith filed an application for post-conviction

_____

I don't know what. I pushed her back. I reached for a knife and I stabbed her several times; then I stabbed Christy Johnson several times after he got up off the floor. I got the keys and went and got the car.

(J.A. at 1073-74.)

4

relief (PCR) in state court on July 9, 1986. After an evidentiary hearing, the state PCR court denied Smith's application as to the guilt phase of his trial, but ordered that Smith be resentenced pursuant to Skipper v. South Carolina, 476 U.S. 1 (1986). **4** Neither party appealed this order.

On October 26, 1987, Smith's resentencing trial began. After four days of testimony, the jury recommended the imposition of the death sentence. Following the jury's recommendation, the trial court once again sentenced Smith to death. On direct appeal, the South Carolina Supreme Court affirmed this death sentence. See State v. Smith, 381 S.E.2d 724 (S.C. 1989). The United States Supreme Court denied Smith's petition for a writ of certiorari. See Smith v. South Carolina, 494 U.S. 1060 (1990).

Smith filed an application for PCR in state court on August 13, 1990. After an evidentiary hearing, the state PCR court denied Smith's application. The South Carolina Supreme Court denied Smith's petition for a writ of certiorari. The United States Supreme Court again denied Smith's petition for a writ of certiorari. See Smith v. South Carolina, 515 U.S. 1126 (1995).

On January 24, 1996, Smith filed a habeas petition pursuant to 28 U.S.C.A. § 2254 in the United States District Court for the District of South Carolina. On August 27, 1996, a hearing was held before a federal magistrate judge. In February of 1997, the magistrate judge issued a 151-page Report and Recommendation in which he recommended that the district court deny Smith's request for an evidentiary hearing and federal habeas corpus relief. In June of 1997, the district court adopted the Report and Recommendation and denied Smith's petition for federal habeas relief.

On appeal, Smith contends: (1) that South Carolina's "physical torture" aggravating circumstance is unconstitutional; (2) that his counsel were ineffective for failing to present evidence in mitigation of

_____

**4** In Skipper v. South Carolina , 476 U.S. 1 (1986), the Supreme Court held that a defendant's Eighth and Fourteenth Amendment rights were violated if the sentencing court refused to admit evidence of his adaptability to prison life. Id. at 4-5.

punishment at his resentencing trial; (3) that he was incompetent to stand trial; (4) that the State violated his Sixth Amendment right to counsel; (5) that the grand jury and the petit jury were selected in violation of the Equal Protection Clause; (6) that the trial court's instructions on expert testimony and insanity violated the Sixth Amendment; and (7) that the trial court erroneously instructed the jury that its sentencing recommendation must be unanimous. We address Smith's arguments in turn.

II.

A.

In his federal habeas petition, Smith first contends that South Carolina's "physical torture" aggravating circumstance does not require an intent to torture and, therefore, fails to genuinely narrow the class of persons eligible for the death penalty. In the alternative, Smith contends that even if the physical torture aggravating circumstance requires an intent to torture, a finding of intent was unsupported by the evidence in this case.

1.

To satisfy the Eighth and Fourteenth Amendments, a state's capital sentencing scheme must suitably channel or limit the jury's discretion in imposing the death penalty. See Lewis v. Jeffers, 497 U.S. 764, 774 (1990); Maynard v. Cartwright, 486 U.S. 356, 362 64 (1988); Godfrey v. Georgia, 446 U.S. 420, 428 (1980) (plurality opinion). Whether a particular aggravating factor suitably channels or limits a jury's discretion depends, in part, on whether it"genuinely narrow[s] the class of persons eligible for the death penalty." Zant v. Stephens, 462 U.S. 862, 877 (1983). An aggravating factor does not genuinely narrow the class of persons eligible for the death penalty "[i]f the sentencer fairly could conclude that [it] applies to every defendant." Arave v. Creech, 507 U.S. 463, 474 (1993). Smith contends that South Carolina's "physical torture" aggravating factor fails to genuinely narrow the class of persons eligible for the death penalty because it does not require an intent to torture separate and distinct from the intent to kill. We disagree.

6

Under South Carolina law, physical torture exists "when the victim is <u>intentionally</u> subjected to serious physical abuse prior to death." <u>State v. Smith</u>, 381 S.E.2d 724, 726 (S.C. 1989) (emphasis added); <u>see also State v. Elmore</u>, 308 S.E.2d 781, 785 n.2 (S.C. 1983). Thus, despite Smith's contentions to the contrary, it is clear that South Carolina law requires an intent to torture. Using the charge upheld in <u>Elmore</u>, 308 S.E.2d at 785 n.2, the trial court defined physical torture as follows:

> Physical torture is the <u>intentional</u> infliction of serious, vile, horrible or inhuman abuse upon the body of another before death. The instantaneous death of the victim does not constitute torture. Physical torture may include the malicious infliction of bodily harm to another by depriving him or her of a member of his or her body or by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member of his or her body, or the <u>intentional</u> and unmerciful prolonging of severe pain and abuse to the body of another, or the <u>intentional</u> and unmerciful infliction of serious and extensive physical pain and abuse to the body of another.

(J.A. at 2093 (emphasis added).) We conclude that the trial court's instruction adequately conveyed to the jury that it had to find an intent to torture.

Moreover, the trial court's definition of torture "make[s it] clear that something other than those factors that a juror might expect to find present in an ordinary murder must be present." <u>Jones v. Murray</u>, 976 F.2d 169, 174 (4th Cir. 1992). In other words, an ordinary person "could [not] conclude that [the `physical torture'] aggravating circumstance applies to <u>every</u> defendant," <u>Arave</u>, 507 U.S. at 474, who intended to kill his victim. <u>Cf. Cartwright</u>, 486 U.S. at 364 (invalidating aggravating circumstance that "an ordinary person could honestly believe" described every murder); <u>Godfrey</u>, 446 U.S. 428-29 (invalidating aggravating circumstance that "[a] person of ordinary sensibility could" honestly believe described "almost every murder"). Accordingly, we hold that South Carolina's "physical torture" aggravating circumstance "genuinely narrow[s] the class of persons eligible for the death penalty." <u>Zant</u>, 462 U.S. at 877.

7

2.

Smith also contends that even if the "physical torture" aggravating circumstance requires an intent to torture, a finding of intent to torture was unsupported by the evidence in this case. This argument, like the last, must fail. The brutality of the murders, as evidenced by the number and nature of the injuries inflicted, was more than sufficient to support the jury's conclusion that Smith intended to torture the Johnsons. Cf. Gilbert v. Moore, No. 96-12, 1998 WL 19936, at *6 (4th Cir. 1998) (noting that the savagery of the attack left no uncertainty concerning whether the defendants acted with intent).

Mr. Johnson's autopsy revealed that he had been stabbed twenty-seven times, including several defensive wounds, on or about his face, neck, chest, hands, wrists, and back. In addition to the stab wounds, Mr. Johnson had "blunt force" injuries consistent with having been struck with a pistol. As a result of those blows, Mr. Johnson's skull was fractured in two separate locations. Mrs. Johnson's autopsy revealed that she had been stabbed seventeen times, including several defensive wounds, on or about her face, back, chest, and hands. Like her husband, Mrs. Johnson had "blunt force" injuries characterized by lacerations, abrasions, and contusions that were consistent with having been struck with a pistol.

Dr. Joel Sexton, the forensic pathologist who performed the autopsies on the Johnsons, testified at trial that most of the Johnsons' wounds were inflicted before death. In addition, Dr. Sexton testified that the wounds were most probably "inflicted during . . . consciousness." (J.A. at 1918.) Dr. Sexton's testimony is supported by the nature of the wounds, the physical evidence discovered at the crime scene, and Smith's own confession.

First, the existence of "defensive wounds" on the wrists and hands of the Johnsons indicate that they were both alive and conscious during the attack and tried to defend themselves. Also, the smearing and pooling of blood at different locations in the Johnsons' home demonstrates that the Johnsons were alive and conscious as they struggled with Smith. Finally, Smith's own account of the murders indicates that the Johnsons were alive and conscious during much of the attack. According to Smith, he first struck Mr. Johnson. When Mrs. Johnson

8

came to her husband's aid, Smith stabbed her several times. After wounding Mrs. Johnson, Smith turned his attention back to Mr. Johnson, whom he stabbed several times. After bludgeoning Mr. Johnson, Smith resumed stabbing Mrs. Johnson. Based upon the foregoing, we conclude that a finding of intent to torture is amply supported by the evidence in this case.

B.

At Smith's resentencing, the trial court submitted several aggravating circumstances to the jury for their consideration. In addition to finding physical torture, the jury, in returning a recommendation of death, found that Smith committed the murders while in the commission of a felony -- larceny with the use of a deadly weapon. In a non-weighing state, such as South Carolina, the jury's reliance on an invalid aggravating factor may not "infect the formal process of deciding whether death is an appropriate penalty" if the jury also "finds at least one valid aggravating factor." Stringer v. Black, 503 U.S. 222, 232 (1992) (noting that if the invalid factor would not have made a difference to the jury's determination the error was harmless). Thus, if the "physical torture" aggravating circumstance were invalid, we must determine whether it infected the jury's decision to sentence Smith to death. See Tuggle v. Netherland, 79 F.3d 1386, 1391-92 (4th Cir.) (noting that harmless error analysis is appropriate when one aggravating factor is determined to be invalid), cert. denied, 117 S. Ct. 237 (1996); see also Brecht v. Abrahamson , 507 U.S. 619, 637 (1993) (noting that federal court may not grant habeas relief unless convinced that "the error `had substantial and injurious effect or influence in determining the . . . verdict'" (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946))).

In Tuggle, this Court considered six factors in determining whether an invalid aggravating circumstance had a substantial and injurious effect or influence on the jury's verdict. See Tuggle, 79 F.3d at 1393. They include:

> (1) the strength of the remaining aggravating circumstance; (2) the evidence admitted . . . at the sentencing hearing to establish the invalid aggravating circumstance; (3) the evidence improperly excluded at the sentencing hearing;

9

(4) the nature of any mitigating evidence; (5) the closing argument of the prosecutor; and (6) any indication that the jury was hesitant or entertained doubt in reaching its sentencing determination.

Id. at 1393. The district court, after a thorough analysis of these six factors, concluded that any error in the "physical torture" aggravating circumstance was harmless. We agree.

As to the first Tuggle factor, the jury also found the presence of a second aggravating circumstance -- commission of a felony. Specifically, the jury found larceny with the use of a deadly weapon. That finding is clearly supported by the record. Smith confessed to killing the Johnsons with a knife. Moreover, he confessed to taking the Johnsons' car. Even Smith concedes, as he must, that there is "sufficient evidentiary support for the [larceny] aggravator." (Appellant's Br. at 20-21.)

As to the second Tuggle factor, the State would have introduced evidence regarding the brutal manner in which Smith killed the Johnsons during sentencing even absent the question of physical torture. Moreover, but for the fact that Smith was resentenced pursuant to Skipper v. South Carolina, 476 U.S. 1 (1986), the jury would have heard the identical evidence during the guilt phase. As a result, the jury did not hear any evidence that was only relevant to the allegedly invalid aggravating circumstance.

Because Smith does not contend that any evidence was improperly excluded, the third Tuggle factor has no application to the issues presented here. Likewise, Smith concedes that the fourth Tuggle factor has "no bearing here." (Appellant's Br. at 20.)

With respect to the fifth Tuggle factor, the prosecutor's closing argument focused on all of the statutory aggravating circumstances presented to the jury. Smith argues, however, that the prosecution was primarily concerned with the "physical torture" aggravator. For support, Smith notes only that the prosecutor's closing argument on the "physical torture" aggravator required four pages of transcription, whereas his closing argument on the "larceny" aggravator required less than one page. That fact alone, however, is hardly evidence that

10

the prosecution <u>primarily</u> focused on the "physical torture" aggravator. To find the "larceny" aggravator, the jury had to find only that Smith used a deadly weapon and took a piece of property belonging to the Johnsons. Here, the defense did not seriously dispute, nor could they, that Smith used a knife and stole the Johnsons' car. As a result, it is not surprising that the prosecution spent less time explaining to the jury the elements of, and the evidence supporting, the "larceny" aggravating circumstance than it spent explaining the elements of, and the evidence supporting, the "physical torture" aggravating circumstance.

With respect to the sixth <u>Tuggle</u> factor, the jury returned its sentencing verdict after only two hours of deliberation. Although the jury did send a question to the judge concerning parole, there is no clear evidence indicating that the jury was hesitant or entertained doubt in reaching its sentencing determination.

Applying these factors, we conclude that even if the "physical torture" aggravating circumstance were somehow constitutionally infirm, it did not have a substantial and injurious effect or influence on the jury's decision to sentence Smith to death. As a result, any error was harmless. The record in this case contains an unimpeachable "larceny with a deadly weapon" aggravating circumstance. The jury did not hear any evidence that was only relevant to the allegedly invalid aggravating circumstance. No evidence was improperly excluded as a result of the allegedly invalid aggravating circumstance, and Smith concedes that any error did not affect his ability to introduce mitigating evidence. The prosecution did not argue solely for the allegedly invalid factor during closing argument, and the jury returned its verdict after only two hours of deliberation.

III.

Next, Smith contends that his counsel were ineffective for failing to investigate, prepare, and present evidence in mitigation of punishment at his resentencing trial. In particular, Smith argues that his counsel failed to present evidence that he (1) had a non-violent character and (2) would adapt well to prison. The test for reviewing claims of ineffective assistance of counsel is well established. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Smith must demon-

11

strate that his counsel's performances fell below an objective standard of reasonableness. See id. at 687-91. If he does, Smith must then show that the deficient performance prejudiced his defense to the point that he was deprived of a fair trial. See id. As a result, Smith's counsel may be deemed ineffective only if their "conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686. The question of whether Smith's counsel were ineffective is a mixed question of law and fact that we review de novo. See Griffin v. Warden, 970 F.2d 1355, 1357 (4th Cir. 1992).

A.

After reviewing Smith's contentions, we conclude that his counsel were not objectively unreasonable in failing to present evidence that Smith had a non-violent character. Had Smith's counsel attempted to paint Smith as a non-violent man with a good character, the State could (and most likely would) have introduced evidence that Smith (1) was involved in the murder of David Craig; (2) had been accused of raping and assaulting a young girl; (3) was implicated in the murder of another individual named Patel; and (4) had a reputation in the community for being violent.[5] Because of the aforementioned evidence, Smith's counsel decided that it would be "dangerous" to put Smith's character into issue. We conclude that counsel's strategic decision not to make Smith's character an issue was not only reasonable, but unassailable. See Strickland, 466 U.S. at 689 (noting presumption that conduct being challenged was an appropriate and necessary trial strategy under the circumstances); see also Bell v. Evatt, 72 F.3d 421, 429 (4th Cir. 1995) (recognizing "that strategies devised after extensively investigating the law and facts relevant to any and all probable options are virtually unchallengeable"). Accordingly, Smith's counsel were not ineffective for failing to present evidence that Smith had a non-violent character.

_____

[5] One of Smith's own character witnesses testified at the second State PCR hearing that Smith had a reputation for violence.

B.

Despite Smith's contentions to the contrary, his counsel did introduce evidence of his adaptability to prison. Dr. Lesley Greene testified that she had met with Smith and had reviewed his psychological files and tests. Based upon her evaluation and investigation, Dr. Greene testified that Smith would successfully adapt to prison life. In sum, Smith has simply not demonstrated "that counsel's performance was deficient." Strickland, 466 U.S. at 687.

C.

In addition to the evidence of Smith's adaptability to prison life, Smith's counsel introduced mitigating evidence regarding Smith's mental illness. Dr. Helen Clark testified that when she saw Smith a couple of days after he was arrested, he was showing symptoms of schizophrenia. She testified that, in her opinion, Smith did not know right from wrong at the time of the murders. Smith's counsel also introduced mitigating evidence regarding Smith's lack of intent. Specifically, they used Smith's own confession to illustrate that Smith did not intend to rob and murder the Johnsons. Rather, they argued that the murders occurred as a result of an argument after the Johnsons would not let Smith borrow their car. After reviewing the record, we are convinced that counsel's performance was not deficient.

IV.

Next, Smith contends that he was incompetent to stand trial because he was taking Mellaril.[6] At trial, however, Smith's counsel

_____

[6] "Mellaril is the trade name for thioridazine, an antipsychotic drug." Riggins v. Nevada, 504 U.S. 132, 129 (1992). In Riggins, the Supreme Court held that the defendant's Sixth and Fourteenth Amendment rights were violated by the forced administration of Mellaril during trial. See id. at 135. Unlike the defendant in Riggins , the administration of Mellaril to Smith was suspended before trial. Also unlike the defendant in Riggins, Smith's trial counsel did not contend that Smith was incompetent to stand trial because he was taking Mellaril. Rather, Smith's counsel believed that if Smith stopped taking the drug that his psychosis would be revealed to the jury. Smith concedes that such a condition did not appear.

13

argued that Smith would be incompetent if taken off Mellaril. As a result, this issue was neither raised on direct appeal, nor in Smith's first PCR application. Rather, Smith raised this issue for the first time in his second PCR application. As a result, the state PCR judge dismissed this claim as procedurally defaulted.[7] See Aice v. State, 409 S.E.2d 392, 394 (S.C. 1991) (holding that "as long as it was possible to raise the argument in his first PCR application, an applicant may not raise it in a successive application"). This claim is now barred from further state collateral review.

Because Smith did not properly present this claim in state court, we hold that Smith is procedurally barred from raising the claim before us on federal habeas review. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991) (holding that a claim dismissed on a state procedural rule is procedurally barred on federal habeas review); Harris v. Reed, 489 U.S. 255, 262 (1989) (holding that a federal habeas court may not review a claim when a state court has declined to consider its merits on the basis of an adequate and independent state procedural rule). Smith contends, however, that competence to stand trial cannot be waived and, therefore, cannot be defaulted. For the reasons that follow, we disagree.

The Supreme Court has held that an incompetent defendant cannot knowingly or intelligently waive his right to have the court determine his competency. See Drope v. Missouri, 420 U.S. 162, 171 (1975) (noting that competency is essential to a fair trial); Pate v. Robinson, 383 U.S. 375, 378 (1966) (holding that the conviction of an incompetent defendant violates due process). Neither Drope nor Pate, however, support Smith's argument that competence to stand trial may be raised at any time. The rather unremarkable premise behind Drope and Pate is that an incompetent defendant cannot knowingly or intelligently waive his rights. See Pate, 383 U.S. at 384. Unlike waiver, which focuses on whether conduct is voluntary and knowing, the procedural default doctrine focuses on comity, federalism, and judicial economy.

_____

[7] Smith failed to present this issue to the South Carolina Supreme Court when he petitioned for a writ of certiorari.

14

In Noble v. Barnett, 24 F.3d 582 (4th Cir. 1994), this Court specifically held that the rules governing habeas petitions had "nothing to do with the doctrine of waiver." Id. at 588. In so holding, this Court flatly rejected the argument that "a claim of incompetency to stand trial can never be forfeited." Id. 587; see also Clanton v. Muncy, 845 F.2d 1238, 1240-41 (4th Cir. 1988) (holding that a claim of incompetency to stand trial may be defaulted). Although Noble dealt with the abuse of the writ doctrine, we believe that its holding applies with equal (if not greater) force here. Put simply, the rationale of Drope and Pate are inapposite in the context of a procedural default. But see Bundy v. Dugger, 816 F.2d 564, 567 (11th Cir. 1987) (stating that "a defendant can challenge his competency to stand trial for the first time in his initial habeas petition"). Accordingly, we hold that a claim of incompetency to stand trial asserted for the first time in a federal habeas petition is subject to procedural default. Because Smith does not argue that he can demonstrate cause for and resulting prejudice from the default or that he has suffered a fundamental miscarriage of justice, the district court did not err in denying Smith an evidentiary hearing on his competence to stand trial.[8] See Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977) (holding that if the petitioner can show cause for the state procedural default, and prejudice resulting therefrom, the federal courts can address the issue's merits); Murray v. Carrier, 477 U.S. 478, 495-96 (1986) (stating that where a petitioner has suffered a fundamental miscarriage of justice a decision on the merits is appropriate without regard to a procedural default).

_____

[8] Prior to the start of Smith's first trial, a hearing was held to determine whether Smith was competent to stand trial. Based upon the evidence introduced at that hearing, the trial court found, beyond a reasonable doubt, that Smith was competent to stand trial. This factual finding is entitled to a presumption of correctness in a federal habeas corpus proceeding. See 28 U.S.C.A. § 2254(d) (West 1994). Because Smith failed to present clear and convincing evidence to the contrary, the magistrate judge determined that the issue was without merit and should be dismissed. The district court adopted the magistrate judge's Report and Recommendation and denied Smith's request for a competency hearing. If the issue were not procedurally defaulted, we would do likewise.

15

V.

Next, Smith contends that his Sixth Amendment right to effective assistance of counsel was violated when Dr. Spurgeon Cole, a psychologist originally retained by Smith, testified on behalf of the State that Smith was not legally insane.**9** Specifically, Dr. Cole testified that Dr. Helen Clark, the psychologist ultimately retained by Smith to help establish the insanity defense, misinterpreted Smith's test results. According to Smith, Dr. Cole's testimony was based upon confidential information protected by the attorney-client privilege.

We begin our analysis of Smith's claim by noting that the "attorney-client privilege is a creation of the common law, not the Constitution." Lange v. Young, 869 F.2d 1008, 1012 n.2 (7th Cir. 1989). Because federal habeas review is limited to "violations of the United States Constitution or its law and treaties," Cooper v. Taylor, 103 F.3d 366, 370 (4th Cir. 1996) (en banc), cert. denied, 118 S. Ct. 83 (1997), a mere violation of Smith's attorney-client privilege would not warrant habeas relief, see Lange, 869 F.2d at 1012 n.2 (noting that "[e]ven if a violation of the attorney-client privilege occurred, this violation alone would be insufficient grounds for [habeas] relief"). Thus, even though South Carolina has extended the attorney-client privilege to cover a defendant's communications with a psychiatrist employed to help prepare the insanity defense,**10** see State v.

_____

**9** Dr. Cole testified at the first state PCR hearing that he only testified for the State because Smith's trial counsel thought that it would be helpful to the defense. Smith's trial counsel confirmed Dr. Cole's explanation, admitting that they honestly believed that Dr. Cole's testimony would be helpful to the defense. Smith's trial counsel also thought that if they objected to Dr. Cole's testimony the State would call Dr. John Dunlap -- the psychiatrist from the South Carolina Department of Mental Health who testified at Smith's pre-trial competency hearing that he was capable of assisting his counsel and competent to stand trial -- whose testimony they believed would be less helpful to the defense.

**10** The South Carolina Supreme Court rejected Smith's claim on direct appeal because "[t]he record [was] void of any evidence [that Dr. Cole] was hired to help establish the insanity defense." State v. Smith, 334 S.E.2d 277, 279 (S.C. 1985) (concluding that "Dr. Cole was employed solely to aid in the defense's jury selection"). As a result, the South Carolina Supreme Court concluded that no confidential relationship existed between the two.

16

Hitopoulus, 309 S.E.2d 747, 749 (S.C. 1983), Smith is entitled to habeas relief only if the Sixth Amendment is violated when the State calls a defense-retained psychiatrist as a rebuttal witness. The State argues that granting Smith the relief he seeks would create a new rule of constitutional law. As a result, we "must  apply Teague before considering the merits of [Smith's] claim." Caspari v. Bohlen, 510 U.S. 383, 389 (1994) (noting that, if raised by the State, the Teague inquiry is a threshold matter).

It is well established that "new rules will not be applied or announced in cases on collateral review unless they fall into one of two exceptions." Penry v. Lynaugh, 492 U.S. 302, 313 (1989) (citing Teague v. Lane, 489 U.S. 288, 311-13 (1989)). **11** A rule is "new" for purposes of Teague if "the result was not dictated by precedent existing at the time the defendant's conviction [and sentence] became final." Id. at 301; see also Caspari , 510 U.S. at 389 (1994) (outlining the Teague analysis). In other words, a rule is "new" if reasonable jurists considering the claim would not "`have felt compelled by existing precedent' to rule in [the petitioner's] favor." See Graham v. Collins, 506 U.S. 461, 467 (1993) (emphasis added) (quoting Saffle v. Parks, 494 U.S. 484, 488 (1990)).

Smith's sentence became final in March of 1990, when the United States Supreme Court denied his petition for certiorari on direct appeal. See Smith v. South Carolina, 494 U.S. 1060 (1990). Therefore, we must determine whether the rule necessary to produce the result Smith seeks -- the State violates the Sixth Amendment when it calls a defense-retained psychiatrist as a witness -- was dictated or compelled by precedent existing at that time. See Teague, 489 U.S. at 301.

_____

**11** As noted above, Teague is subject to two exceptions.

> First, a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe. Second, a new rule should be applied retroactively if it requires the observance of those procedures that are implicit in the concept of ordered liberty.

Teague v. Lane, 489 U.S. 288, 307 (1989) (internal quotation marks, alterations, and citations omitted). Neither exception is relevant here.

17

"Surveying the legal landscape" in March of 1990, Graham, 506 U.S. at 468, a reasonable jurist would have found no case dictating the result Smith now seeks. Indeed, that jurist would have found at least two cases to the contrary. In Noggle v. Marshall, 706 F.2d 1408 (6th Cir. 1983), the Sixth Circuit held that the Sixth Amendment is not violated when the State calls on rebuttal a defense-retained psychiatrist. Id. at 1415-16. Similarly, in Lange, 869 F.2d at 1008, the Seventh Circuit held that a defendant's Sixth Amendment right to counsel was not violated when the state called as a witness a psychiatrist originally contacted by the defense. Id. at 1012-13. We cannot say that either of these opinions is objectively unreasonable. See O'Dell v. Netherland, 95 F.3d 1214, 1223 (4th Cir. 1996) (en banc) (noting that a rule is not "new" if "a contrary conclusion would have been objectively unreasonable"), aff'd, 117 S. Ct. 1969 (1997). We conclude, therefore, that a reasonable jurist in March of 1990 would not have felt compelled to adopt the rule that Smith now seeks. Because the rule Smith seeks is "new" for purposes of Teague, it cannot be used to disturb his death sentence.

VI.

In his petition seeking federal habeas relief, Smith further claims that both the grand jury and the petit jury were selected in violation of the Equal Protection Clause and that the trial court's instructions on expert testimony and insanity violated the Sixth Amendment. Smith concedes, however, that these claims were not specifically raised on direct appeal. Nevertheless, Smith argues that the claims are not procedurally defaulted because the Supreme Court of South Carolina reviewed these issues when it conducted its in favorem vitae review.[12]

We have reviewed and rejected the identical argument several times. See Kornahrens v. Evatt, 66 F.3d 1350, 1362-63 (4th Cir. 1995) (holding that a record-based claim reviewed by the South Caro-

_____

[12] Under in favorem vitae (in favor of life) review, "the appellate court searches the record for error without regard to whether an objection has preserved it." Kornahrens v. Evatt, 66 F.3d 1350, 1362 (4th Cir. 1995) (internal quotation marks omitted). In favorem vitae review has been abolished in the State of South Carolina. See id.

18

lina Supreme Court pursuant to the doctrine of in favorem vitae is procedurally defaulted); see also Arnold v. Evatt, 113 F.3d 1352, 1357-58 (4th Cir. 1997) (same), cert. denied, 118 S. Ct. 715 (1998); Matthews v. Evatt, 105 F.3d 907, 912-13 (4th Cir.) (same), cert. denied, 118 S. Ct. 102 (1997). As we noted in Kornahrens:

> Even with in favorem vitae review, unless the prisoner raises the specific objections before the state court, we cannot determine whether the state court has properly applied federal constitutional principles, or for that matter, whether the state court has even considered these issues at all. In short, we have no state court judgment to review.

66 F.3d at 1362. Because Smith failed to specifically raise these claims on direct appeal, we conclude that they are procedurally barred pursuant to our previous decisions in Kornahrens , Matthews, and Arnold.**13**

Smith's contention that Kornahrens, Matthews, and Arnold were wrongly decided and should be overruled need not detain us long. It is well established that a decision of this Court is binding on other panels unless it is overruled by a subsequent en banc opinion of the Court or an intervening decision of the United States Supreme Court. See Industrial Turnaround Corp. v. NLRB, 115 F.3d 248, 254 (4th Cir. 1997). Because the holdings in Kornahrens , Matthews, and Arnold have not been called into question by either the en banc Court or the Supreme Court, they continue to be the binding law of this Circuit.

VII.

Finally, at Smith's resentencing the trial court instructed the jury that its sentencing recommendation, whether the death penalty or a life sentence, must be unanimous. Smith contends that the trial court's instruction misstated South Carolina law, see S.C. Code Ann. § 16-3-

_____

**13** Because Smith does not argue that he can demonstrate cause and prejudice or a fundamental miscarriage of justice to excuse the default, we do not consider whether either exists. See Kornahrens v. Evatt, 66 F.3d 1350, 1361-63 (4th Cir. 1995).

20(c) (Law. Co-op. 1985 & Supp. 1997) (providing that if a jury in a capital case is unable to agree on the death penalty, the defendant must be sentenced to life imprisonment), and violated the rule established in Simmons v. South Carolina, 512 U.S. 154, 165 (1994) (holding that due process requires that a criminal defendant be allowed to argue his parole ineligibility to rebut prosecution arguments of future dangerousness). For the reasons that follow, we find both arguments to be without merit.

A.

In response to Smith's first argument -- that the instruction in question misstates South Carolina law -- the State cites a series of state court decisions that it alleges have found the identical instruction to be a correct statement of South Carolina law. Whether the cases cited by the State so hold is of no import. It is well established that "basic principles of federalism permit us to review only those state-court decisions that implicate federal constitutional rights." Kornahrens v. Evatt, 66 F.3d 1350, 1357 (4th Cir. 1995) (emphasis added); see also Cooper v. Taylor, 103 F.3d 366, 370 (4th Cir. 1996) (en banc) (stating that federal habeas review is limited to "violations of the United States Constitution or its law and treaties"), cert. denied, 118 S. Ct. 83 (1997). We will not, therefore, entertain Smith's contention that the instruction in question misstates South Carolina law.

B.

In response to Smith's second argument -- that the instruction in question violates the rule announced in Simmons [14] -- the State argues that the rule established in Simmons did not overrule our decision in Gaskins v. McKellar, 916 F.2d 941 (4th Cir. 1990), in which we held that an identical instruction did not have any effect on the jury's sentencing decision. Id. at 955 (holding that"it is inconceivable that the disputed instruction could have caused the jurors unanimously to impose a death sentence out of fear of mistrial should they not be

_____

[14] In Simmons v. South Carolina, 512 U.S. 154 (1994), the Supreme Court held that due process requires that a criminal defendant be allowed to argue his parole ineligibility to rebut prosecution arguments of future dangerousness. Id. at 165.

20

unanimous in their decision to impose life imprisonment"). We need not decide whether Simmons overruled Gaskins because even if it did, Smith is not entitled to habeas relief. A state prisoner may not upset his sentence on federal habeas review if the court-made rule of which he seeks the benefit is "new." See Teague v. Lane, 489 U.S. 288, 301 (1989); see also O'Dell v. Netherland, 117 S. Ct. 1969, 1973 (1997); Graham v. Collins, 506 U.S. 461, 466-67 (1993). In a case decided well over one year before the parties filed their briefs in this matter, we held that "Simmons was the paradigmatic `new rule.'" O'Dell v. Netherland, 95 F.3d 1214, 1218 (4th Cir. 1996) (en banc), aff'd, 117 S. Ct. 1969 (1997). Accordingly, the rule announced in Simmons cannot be used to disturb Smith's death sentence.**15**

VIII.

Because Smith has failed to provide any grounds upon which habeas relief may be granted, the decision of the district court is hereby affirmed.

AFFIRMED

DIANA GRIBBON MOTZ, concurring:

If the "physical torture" aggravating circumstance were invalid, see ante section II.B, I could not conclude that the error would not have infected the jury's decision to sentence Smith to death. However, for the reasons set forth in section II.A of the opinion of the court, I believe the district court correctly instructed the jury as to "physical torture" and the evidence supported the jury's finding of physical torture. Accordingly, I concur in the judgment and in the opinion of the court, except for section II.B.

_____

**15** Smith's sentence became final in 1990, when the United States Supreme Court denied his petition for certiorari on direct appeal. See Smith v. South Carolina, 494 U.S. 1060 (1990). Simmons, which we held created a new rule, was decided in 1994.

21